THE DETROIT EDISON COMPANY v PUBLIC SERVICE
COMMISSION

Docket Nos. 61961, 61962. Submitted April 7, 1983, at Lansing.—
Decided July 20, 1983. Leave to appeal applied for.

On April 10, 1975, The Detroit Edison Company petitioned the
Michigan Public Service Commission for permission to increase
its electric rates by $177,865,000. Along with the petition,
Edison filed a motion for partial and immediate interim rate
relief in the amount of $88,112,000. The Attorney General
intervened on behalf of the public, opposed the proposed in-
crease, and requested a reduction of $84,076,000 in existing
rates. Public hearings on the petition were begun. On July 24,
1975, Edison renewed its motion for interim relief, this time for
$84,800,000. On September 5, 1975, the commission staff recom-
mended that Edison be granted final rate relief in the amount
of $105,900,000. One week later, the commission staff recom-
mended that Edison be granted interim rate relief in the
amount of $39,833,000. On January 9, 1976, the commission
reported to the Governor that it was unable to conclude the
rate proceeding within nine months. On February 9, 1976, the
commission denied Edison's request for interim rate relief. On
February 27, 1976, an administrative hearing officer recom-
mended that Edison be granted final rate relief in the amount
of $88,334,000. On March 30, 1976, the commission entered its
final order, granting Edison final rate relief in the amount of
$62,425,000, effective March 31, 1976. Edison filed a petition in
Ingham Circuit Court for judicial review of the commission's
final order. Edison also requested injunctive relief for a rate

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 64 Am Jur 2d, Public Utilities § 285.
[2] 64 Am Jur 2d, Public Utilities § 286.
[3] 64 Am Jur 2d, Public Utilities § 280.
[4] 2 Am Jur 2d, Administrative Law §§ 466, 590-592.
[5] 64 Am Jur 2d, Public Utilities § 134.
[6] 64 Am Jur 2d, Public Utilities § 175.
Charitable contributions by public utility as part of operating
expense. 59 ALR3d 941.
[7] 64 Am Jur 2d, Public Utilities §§ 189-191.

increase pending judicial review. The court, Donald Reisig, J., granted Edison's request for injunctive relief and permitted it to collect an interim rate increase in the amount of $13,846,000 under bond. The Attorney General and the commission sought leave to appeal the injunctive order to the Court of Appeals, but leave was denied. Leave to appeal to the Supreme Court was sought, but leave to appeal to that Court was also denied, 398 Mich 803 (1976). Edison collected the interim rate increase approved by the circuit court. The case, still pending in circuit court, was assigned to Michael Harrison, J., Judge Reisig having resigned. Following trial, Judge Harrison remanded the case to the commission to consider additional evidence. The commission then rendered its final decision on remand, affirming its previous final order. The Ingham Circuit Court, Michael G. Harrison, J., entered a judgment affirming the commission's decision. Edison appealed. Edison's appeal, docket no. 61961, was consolidated on the Court of Appeals own motion with an appeal by the Attorney General and others in the case of *Attorney General v Michigan Public Service Comm,* docket no. 61962, involving numerous appeals. *Held:*

1. Edison's argument that the commission and circuit court erred by failing to consider the "cumulative impact" of the commission's alleged failure to adopt an adequate test year, its refusal to award interim rate relief, its failure to reach a timely decision and its denial of an earnings erosion allowance is valid, if at all, only if the individual claims of error have some merit in and of themselves.

2. Edison's argument that the commission chose an inappropriate test year on which to base the rates Edison could charge in 1976 is rejected. Under the facts of this case, Edison cannot show that the test year adopted by the commission is unlawful or unreasonable or unsupported by the evidence.

3. Edison's contention that the commission erred by failing to reach a decision in the case within nine months is rejected. The nine-month provision of the statute which sets forth the procedure for expediting decision by the commission is not a requirement; it is only a goal. The sanction imposed by the statute for noncompliance with the nine-month period is merely that the commission report the delay to the Governor and Legislature. The commission reported the delay as required by statute.

4. Edison's contention that the commission erred by refusing to grant it interim rate relief is rejected. The decision to grant interim relief is discretionary with the commission. The commission denied interim rate relief because it concluded that the evidence before it did not establish a need for relief at that

time. The commission's order denying interim rate relief was not unlawful or unreasonable under the circumstances. The commission did not abuse its discretion by denying interim rate relief.

5. Edison has failed to show by clear and satisfactory evidence that the commission erred by refusing to award an earnings erosion allowance. Edison did not supply proof of a need for an earnings erosion allowance by relevant, substantial and material evidence on the whole record.

6. Edison's argument that the rates established in this case were unreasonable and confiscatory because they did not properly take into account the fact that the company had historically failed to realize its authorized rate of return and because even the present rate increase did not allow the company to realize its authorized rate of return within a reasonable time after the rate was set in March, 1976, is rejected. An authorized rate of return is not a guarantee that the utility will actually earn that amount. Furthermore, the commission has broad discretion to decide what is a reasonable rate of return. In addition, the exhibits Edison relied on were seriously deficient.

7. Edison's contention that the commission erred in the way in which it required Edison to write off or pay back to ratepayers deferred Michigan income taxes which no longer had to be paid when the corporate income tax was eliminated by the Single Business Tax Act is rejected. Edison has not shown by clear and satisfactory evidence that the commission's decision is unreasonable or that it is unsupported by relevant, competent and material evidence on the whole record.

8. The commission did not err by disallowing a cost of service or operating expense deduction for $94,803 worth of charitable contributions the utility made to various Michigan and out-of-state educational institutions during 1974 and 1975, while at the same time allowing cost of service treatment to $220,000 worth of contributions to the Metropolitan Fund and the Urban Progress Fund. The commission has discretion to allow operating expense deductions for charitable contributions, and it expressed a rational basis for allowing the deductions to the Detroit charities while disallowing the others. Edison has not shown that the commission abused its discretion.

Affirmed.

1. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — UTILITY RATES.
   All rates fixed by the Michigan Public Service Commission are prima facie lawful and reasonable until finally found otherwise

in an action brought to set aside the rates pursuant to statute (MCL 462.25; MSA 22.44).

2. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — APPEAL.

A party appealing an order of the Michigan Public Service Commission has the burden of showing by clear and satisfactory evidence that the order is unlawful or unreasonable; the appellant also has the burden of showing that the findings of fact of the commission are not supported by competent, material and substantial evidence on the whole record (Const 1963, art 6, § 28; MCL 462.26[e]; MSA 22.45[e]).

3. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — NINE-MONTH RULE.

The Michigan Public Service Commission is not required to complete a hearing on a petition within nine months of the date of the filing of the petition; the nine-month provision is only a goal, and the only sanction imposed on the commission for failing to meet the nine-month time limit is that the commission report the delay to the Governor and Legislature (MCL 460.6a[4]; MSA 22.13[6a][4]).

4. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — INTERLOCUTORY ORDERS — APPEAL — "UNLAWFUL OR UNREASONABLE" TEST.

An order of the Michigan Public Service Commission granting interim relief is an interlocutory order and reviewable under an "unlawful or unreasonable" test and not a final order reviewable for compliance with the competent, material and substantial evidence test of the constitution and Administrative Procedures Act (Const 1963, art 6, § 28; MCL 24.285; MSA 3.560[185]).

5. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — INTERIM RATE REQUESTS — APPEAL.

An order of the Michigan Public Service Commission on an interim rate request is reviewable in an appeal from the commission's final order.

6. PUBLIC UTILITIES — CHARITABLE CONTRIBUTIONS — OPERATING EXPENSE DEDUCTIONS — PUBLIC SERVICE COMMISSION.

The Michigan Public Service Commission has discretion to allow operating expense deductions for charitable contributions made by public utilities, and it may allow some charitable contributions to be deductible while disallowing others if there is a rational basis for the distinction.

7. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — RATEMAKING —
   JUST AND REASONABLE RATES.

   Public utility ratemaking is a legislative function which the
   Legislature has delegated to the Michigan Public Service Com-
   mission with full discretionary authority to set just and reason-
   able rates; determination of just and reasonable rates requires
   a determination of the reasonable costs of doing business and,
   in making that determination, the commission has discretion to
   determine what charges and expenses to allow as costs of
   operation.

*Foster, Swift, Collins & Coey, P.C.* (by *Theodore W. Swift, David W. McKeague* and *Charles E. Barbieri),* and *Leon S. Cohan, Christopher C. Nern* and *John H. Flynn,* for The Detroit Edison Company.

*Arthur E. D'Hondt* and *Don L. Keskey,* Assistants Attorney General, for the Public Service Commission.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Hugh B. Anderson,* Assistant Attorney General, for intervening defendant-appellee Attorney General.

Before: D. E. HOLBROOK, JR., P.J., and HOOD and T. M. GREEN,* JJ.

PER CURIAM. This is an appeal as of right by The Detroit Edison Company from a December 23, 1981, judgment of the Ingham County Circuit Court, which affirmed a March 30, 1976, order of the Michigan Public Service Commission, granting the utility a rate increase for electrical service in the amount of $62,425,000.

On April 10, 1975, Edison petitioned the commission for permission to increase its electric rates by $177,865,000. The petition was accompanied by

_____
* Circuit judge, sitting on the Court of Appeals by assignment.

the utility's motion for partial and immediate interim rate relief in the amount of $88,112,000. The petition became MPSC case U-4807.

Public hearings began July 14, 1976. In the months thereafter, the record spanned 51 days of hearings and included 6,087 pages of transcript and 108 exhibits. On July 24, 1975, Edison renewed its motion for interim relief, this time in the amount of $84,800,000. On September 5, 1975, the commission staff recommended that the utility be granted final rate relief in the amount of $105,-900,000. A week later, the commission staff recommended that the utility be granted interim rate relief in the amount of $39,833,000.

On January 9, 1976, the commission reported to the Governor that it was unable to conclude the rate proceeding within nine months as required by then MCL 460.6a(3); MSA 22.13(6a)(3), most recently amended by 1982 PA 304 and now subsection 6a(4).

On February 9, 1976, the commission denied the utility's request for interim rate relief, principally because the commission's final decision was expected shortly. On February 27, 1976, the administrative hearing officer recommended that the utility be granted final rate relief in the amount of $88,334,000. On March 30, 1976, the commission entered its final order, granting the utility final rate relief in the amount of $62,425,000, effective March 31, 1976.

On April 28, 1976, Edison filed a petition in Ingham County Circuit Court for judicial review of the commission's final order, pursuant to § 26(a) of the so-called railroad commission act, MCL 462.26(a); MSA 22.45(a). At the same time, the utility requested injunctive relief for a rate increase pending judicial review, pursuant to § 26(b).

After hearing, and by opinion filed May 19, 1976, and order entered May 28, 1976, then Circuit Judge Donald Reisig granted the utility's request for injunctive relief and permitted the utility to collect an interim rate increase in the amount of $13,846,000 under bond. The Attorney General, who had intervened in the case, and the commission sought leave to appeal that injunctive order, but this Court denied leave to appeal on September 30, 1976. See *Detroit Edison Co v Michigan Public Service Comm*, Docket Nos. 28871, 28872, 28091 and 28092. The Attorney General and the commission then sought leave to appeal to the Supreme Court. The Supreme Court also denied leave to appeal. 398 Mich 803 (1976). Edison collected the interim rate increase in its November and December, 1976, utility bills.

Meanwhile, back in circuit court, Judge Reisig had resigned and the case was assigned to Judge Michael Harrison. Judge Harrison conducted a nine-day trial in the summer of 1977 and, by order entered January 13, 1978, he remanded the case to the commission to consider additional evidence, as is permitted by § 26(c) of the railroad commission act, MCL 462.26(c); MSA 22.45(c). The commission rendered its final decision on remand on July 19, 1979. The commission affirmed its previous final order.

On December 23, 1981, Judge Harrison filed an opinion and entered a judgment affirming the commission's decision. Edison appeals, raising several issues.

## I

Edison argues that the commission and circuit court erred by failing to consider the "cumulative impact" of the commission's alleged failure to

adopt an adequate test year, its refusal to award interim rate relief, its failure to reach a timely decision and its denial of an earnings erosion allowance. The failure to consider the overall impact of those rulings resulted in unreasonable, unjust and confiscatory ratemaking in this case, the utility argues. Nevertheless, Edison concedes that it is not appealing those claimed errors in and of themselves. In view of that concession, the "overall impact" argument, if valid at all, is valid only if the individual claims of error have some merit in and of themselves.

## II

Edison argues that the commission chose an inappropriate test year on which to base the rates the utility could charge in 1976. The test year adopted by the commission was based on actual data showing the business experience of the company in the first six months of 1975 and data projected into the last six months of 1975. But, the company argues, by the time the commission entered its final order in March of 1976, the data and test year were already nine months out of date. So, the company says, in spite of the commission's protestations that it was using current or projected test year data, the test year was actually an historical one. Therefore, the argument goes, the test year was inadequate because it led to rates which did not adequately reflect changes in rate base, income and expenses and the effects of inflation on those factors. Edison argues that the commission should have adopted a test year that more accurately resembled the year in which the rates were to be collected and, failing that, the commission should have adopted some adjustment in rates (for example, interim relief or an earnings erosion

allowance) to afford the company a reasonable opportunity to earn its authorized rate of return. Edison argues that the circuit court erred by failing to address the effects of adopting an inadequate historical test year and concludes that: "The Court's lack of consideration or understanding of such consequences is indicative of the Court's failure to consider the overall impact of its Order."

The scope of review and the burden of proof on appeal are prescribed by statute. Under § 25 of the railroad commission act, rates set by the commission "shall be in force and shall be prima facie, lawful and reasonable until finally found otherwise * * *". MCL 462.25; MSA 22.44. *Michigan Bell Telephone Co v Public Service Comm,* 332 Mich 7; 50 NW2d 826 (1952); *Attorney General v Public Service Comm,* 118 Mich App 311; 324 NW2d 628 (1982); *Consumers Power Co v Public Service Comm,* 78 Mich App 581; 261 NW2d 10 (1977); *Attorney General v Public Service Comm,* 63 Mich App 69; 234 NW2d 407 (1975), *lv den* 395 Mich 779 (1975). On appeal, the appellant has the burden "to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be". MCL 462.26(e); MSA 22.45(e). In any appeal, the appellant is required to show that findings of fact by the commission are not supported by competent, material and substantial evidence on the whole record. Const 1963, art 6, § 28; *Great Lakes Steel Div of National Steel Corp v Public Service Comm,* 416 Mich 166; 330 NW2d 380 (1982); *Consumers Power Co v Public Service Comm, supra.*

Under the facts of this case, Edison cannot show that the test year adopted by the commission is unlawful or unreasonable or unsupported by the evidence. Edison's application for a rate increase

proposed a 1974 historical test year which used actual data for the year or, alternatively, a 1975 test year based upon projections. Edison did not object before the commission about its use of a 1975 test year. Nor did Edison, or any other party, advocate the use of a calendar 1976 test year when the case was before the commission.

Not only did Edison urge the adoption of a 1974 or 1975 test year, but the commission's adoption of a 1975 test year was a positive break from past practice. The commission had traditionally used only historical test years to set future rates, but in this case broke from that tradition in an attempt to get closer to recent experience in order to set prospective rates which would more nearly reflect past experience, increased by projected revenues and cost estimates.

### III

Next, Edison contends that the commission erred by failing to reach a decision in the case within nine months, allegedly as required by MCL 460.6a(2); MSA 22.13(6a)(2), which provides:

"The commission shall adopt such rules and procedures for the filing, investigation and hearing of petitions or applications to increase or decrease utility rates and charges as the commission finds necessary or appropriate to enable it to reach a final decision with respect to such petitions or applications within a period of 9 months from the filing thereof. * * *."

Edison does not persuade by clear and satisfactory evidence that the commission erred by not completing the hearing within nine months. The nine-month provision of the statute is not a requirement; it is only a goal. The sanction imposed

by the statute for noncompliance with the nine-month period is merely that the commission report the delay to the Governor and Legislature. Former MCL 460.6a(3); MSA 22.13(6a)(3), now § 6a(4). The commission did report the delay as required by statute.

Not only was the commission not required to decide the case within nine months under the statute, but also it was unlikely that it could have done so in this complex case. As the commission pointed out in its report to the circuit court on remand:

"In this regard, the commission is not the sole master of its own house. The Legislature requires that the commission follow the 'contested case' provisions of the Administrative Procedures Act of 1969 * * * in deciding rate cases. The 'nine month rule,' * * * did not eliminate this requirement. The commission does not control the number of parties or the number and complexity of the issues raised. Each party is entitled to present a direct case * * * and to cross-examine all of the other parties' witnesses; except where parties with substantially the same positions consolidate cross-examination. Some time is saved by the requirement that prepared testimony be filed for direct cases. However, because rates are set for the future, it is always the future, an open-ended subject, which is on trial, and a very large number of areas are technically relevant. It is thus extremely difficult to put tight time limits on cross-examination. Moreover, because rates go into effect prospectively, intervenors opposed to rate increases have a strong incentive to extend cross-examination. The parties must also have sufficient time to prepare and file briefs and exceptions, and sometimes reply briefs and replies to exceptions."

* * *

"Because almost every major order is appealed by both the company and the Attorney General, and because the courts insist upon a detailed explanation of the

commission's decision on each contested issue, the commission must write at great length. In this case, the commission's final opinion and order was 86 typewritten pages. And the commission regulates 25 electric utilities, 51 telephone companies, 8 gas companies, and virtually all intrastate inter-city commercial bus and truck operations. Thus, in many cases, it is humanly impossible for the commission to do all it is required to do, that is, comply with the procedural requirements of the Administrative Procedures Act, make detailed findings of fact and conclusions of law on all contested issues, and still render a final decision within nine months from the date of the application."

Finally, it should be acknowledged that it was in this case that the commission formulated and implemented substantial changes in rate regulation. The commission adopted a number of innovations designed to allow utilities to recover costs sooner, including recognition of foreseeable future expenses, adoption of a purchased power adjustment clause, refinement of the automatic fuel adjustment clause, adoption of new rate designs aimed at moderating Edison's peak load and reducing future construction requirements, among other items.

IV

Next, Edison contends that the commission erred by refusing to grant it interim relief pursuant to § 6a(1) of the act. That section provides, in part, that the commission "pending the submission of all proofs by any interested parties, may in its discretion and upon written motion by such utility make a finding and enter an order granting partial and immediate relief * * *". MCL 460.6a(1); MSA 22.13(6a)(1). Had the commission done so,

Edison argues, it would have eliminated the injustice caused by regulatory lag. The commission and the circuit court should have considered the effect that the denial of interim relief had on the company's ability to earn a reasonable rate of return, Edison argues. Edison faults the circuit court, which stated that the absence of interim relief created "an injury without a remedy", for failing to consider that injury in its overall review of the reasonableness of the commission order.

We begin our discussion with a procedural point.

The claim of the MPSC and the Attorney General, that the commission's refusal to grant interim relief was a final order, appealable if at all only within 30 days, must be rejected. Recently, in *Great Lakes Steel v Public Service Comm, supra,* reversing 94 Mich App 694; 290 NW2d 54 (1980), on which appellees rely in part, the Supreme Court held that an order granting interim relief is an interlocutory order and reviewable under an "unlawful or unreasonable" test and not a final order reviewable for compliance with the competent, material and substantial evidence test of the Administrative Procedures Act and the constitution. MCL 24.285; MSA 3.560(185); Const 1963, art 6, § 28. Since an order granting interim relief (and, by the same token, an order denying interim relief) is not a final order, appellees cannot insist that Edison was required to appeal the order within 30 days or never. Besides, the *Great Lakes Steel* decision declares that an order on an interim rate request is reviewable in an appeal from the commission's final order.

On the merits, the commission's refusal to grant interim rate relief presents a close question. Judge Reisig granted the utility a $13.8 million surcharge, in part, because of the commission's re-

fusal. In addition, Judge Harrison thought that the commission should have granted interim relief.

Nevertheless, it is clear that the decision to grant interim relief is discretionary with the commission. MCL 460.6a(1); MSA 22.13(6a)(1) provides in pertinent part: "* * * the commission, pending the submission of all proofs by any interested parties, may *in its discretion* and upon written motion by such utility make a finding and enter an order granting partial and immediate relief * * *." (Emphasis added.) Court decisions recognize that discretion. *Consumers Power Co v Public Service Comm,* 415 Mich 134; 327 NW2d 875 (1982); *Attorney General v Public Service Comm,* 63 Mich App 69; 234 NW2d 407 (1975). .

We find no abuse of discretion. The commission denied interim rate relief because it concluded that the evidence before it did not establish a need for relief at that time. Further, when the commission denied relief on February 9, 1976, it was working on Edison's request for final relief in the rate case. It expected to be able to enter a final order within a couple of months. In fact, it entered its final order, granting Edison $62.4 million rate relief, less than two months thereafter. Although the commission had reason to believe at the time that Edison was facing a revenue deficiency, it did not feel that the company would suffer irreparable harm by a denial of partial relief at that time, especially in view of the fact that it expected to enter a final order in the near future. That was consistent with guidelines the commission announced in its "Interpretive and Informational Statement 1975-4". We agree with the commission that not every showing of a revenue deficiency, without more, mandates interim relief. Otherwise, the commission's discretion under § 6a(1) would be nullified.

Our review of the commission's interim action convinces us that the commission's denial of interim relief was not unlawful or unreasonable under all of the circumstances. Although the circuit court expressed the opinion that Edison should have had interim relief, it ultimately concluded, after review of the entire proceedings, that the commission's final order was not unlawful or unreasonable. We agree.

## V

Edison next complains that the commission erred by failing to award an earnings erosion allowance in its final order. Edison argues that there is a legal basis for allowing such an allowance because, under *General Telephone Co of Michigan v Public Service Comm,* 341 Mich 620; 67 NW2d 882 (1954), the commission is required to consider factors that will influence yields in the reasonable future. Besides, Edison argues, the commission did allow earnings erosion allowances in two earlier cases, U-4257 (1974) and U-4570 (1975), and the commission recognized the effect of earnings erosion in all later cases, including U-5108 (1977), U-5507 (1978), U-6006 (1979) and U-6488 (1980). The commission's failure to allow an earnings erosion allowance in this case was a "dramatic departure" from past practice, according to Edison. In addition, the company says, contrary to what the commission held, the adoption of an allegedly more current test year did not cure the revenue deficiency.

Edison argues that there was a very clear need for an earnings erosion allowance in this case. For years, the company had failed to earn its authorized rate of return. The rates awarded in this

case were based on outdated historical data. But a proper test year should reflect conditions at the date of the commission's final decision, not conditions at the time an application for a rate increase is filed. Further, the company argues, the failure to give an earnings erosion allowance was not justified by the fact that the utility could recover increased costs under nearly automatic purchased power adjustments. Purchased power adjustments are not adequate, the utility says, because they do not eliminate regulatory lag or inflation's effects on expenses.

Edison does not show by clear and satisfactory evidence that the commission erred by refusing to award an earnings erosion allowance. Moreover, Edison did not supply proof of a need for an earnings erosion allowance by relevant, substantial and material evidence on the whole record.

There is nothing in the statute or regulations regarding utility ratemaking that even refers to earnings erosion allowances. Nothing requires that they be awarded. The commission has used that device in other cases, including Edison's cases, where an additional allowance was needed to make up for revenue deficiencies. But, in the past, the commission allowed that kind of allowance in its discretion and as part of its broad statutory power to set rates.

In this case, the commission exercised its discretion when it concluded that an earnings erosion allowance was not necessary. It said:

"The commission has found that the 1975 calendar test period based upon six months of recorded results projected to year end provides the most current and reliable picture of applicant's operating experience for the purpose of establishing rates in this proceeding. This appraoch accounts for the most recent changes

which applicant can expect to experience in the future. As such, there is no need nor justification to provide additional revenues through an earnings erosion allowance. The commission in 1975 labored under the handicap of a 1973 historical test year without any reliable alternative existing on the record in that case. The commission at the same time provided for the parties to employ projected year results in order to permit a more realistic approach to setting rates. That foresight has provided this commission with the foundation for truly setting rates for the future and by its very nature eliminates the need for an earnings erosion allowance."

On remand, the commission was unimpressed with the additional evidence by which Edison tried to prove a revenue deficiency. The commission concluded, "Were this new and additional evidence alone introduced originally before the commission to support an application for rate relief, the commission would find that Edison had failed to carry its burden of proof. The commission sees no reason to lower its evidentiary standards in a remanded proceeding."

On appeal, Judge Harrison was likewise unimpressed with the utility's contention. Judge Harrison wrote:

"In the court's opinion, Edison has failed to demonstrate by clear and convincing evidence that the commission's decision not to include an earnings-erosion allowance was unlawful or unreasonable. It is undisputed that in predicting the phenomena of earnings erosion, the proper indices for computation are net plant, revenues, and expenses. It is further undisputed that earnings erosion traditionally occurs when additions to plant and expenses, such as fuel and purchase-power costs disproportionately outbalance anticipated earnings and revenue beyond the test year used. Rather than addressing the phenomena directly, Edison argues, past policy of the commission as expressed in U-4570 and U-4257 and the cumulative impact of an historical

test year, regulatory lag, lack of interim relief and significant failure to achieve authorized rate of return necessitate earnings-erosion relief. While some of those factors may prompt rate relief, they do not warrant judicial adoption of an earnings-erosion clause. Absent from Edison's aguments is analysis of the proper indices and their relationships beyond the test year elementary to earnings-erosion determination. Without more, the court is of the opinion Edison has not met its statutory burden. As to Edison's remaining argument that it was commission policy in times of high inflation to award earnings-erosion allowances when utilizing, as herein, an historical test year (U-4257 and U-4570), the court notes several fundamental distinctions. Unlike the prior cases, the instant case utilizes a purchased-power adjustment clause and other innovative rate-making procedures to provide relief on the vagaries of inflation and the economy. Moreover, it is uncontradicted that Edison's net plant investment slowed down during the period surrounding the commission's order. These distinctions and their impact upon earnings-erosion computation, regardless to what extent the instant year is 'historical,' support the commission's exercise in discretion in applying a more inclusive and contemporary method of ratemaking. The court will not substitute its judgment for that of the commission where such support exists." (Footnotes omitted.)

## VI

The utility argues that the rates established in this case were unreasonable and confiscatory because they did not properly take into account the fact that the company had historically failed to realize its authorized rate of return and because even the present rate increase did not allow the company to realize its authorized rate of return within a reasonable time after the rate was set in March, 1976. The company argues that Judge

Reisig correctly recognized that injunctive relief in the amount of nearly $14,000,000 was necessary if the company was to have any chance at achieving its authorized rate of return in 1976. The company argues that Judge Reisig's injunctive surcharge should be sustained.

The company argues that the rate relief given by the commission in this case was still insufficient to allow it to earn its authorized rate of return. Even with the relief granted by the commission and by Judge Reisig, Edison argues, its trial Exhibits 7 and 8 showed that Edison would suffer a revenue deficiency in calendar year 1976 of over $52,000,000 and a revenue deficiency for the year ending March 30, 1977, of $29,000,000. For the 12-month period ending March 30, 1977, the company argues, its revenue deficiency was over $10,000,-000. Yet, the company says, its Exhibits 7 and 8, demonstrating the revenue deficiencies, were not impeached or shown to be inaccurate.

The utility's arguments are not convincing on this issue. An authorized rate of return is not a guarantee that the utility will actually earn that amount. See, for example, 1 Priest, Principles of Public Utility Regulation, ch 5, p 83 *et seq.* (1969), and *Michigan Bell Telephone Co v Public Service Comm,* 332 Mich 7; 50 NW2d 826 (1952). Besides, the commission has broad discretion to decide facts, including what is a reasonable rate of return. *Attorney General v Public Service Comm,* 118 Mich App 311; 324 NW2d 628 (1982).

In addition, the exhibits the company relied on were seriously deficient. They are discredited by the commission and by the Attorney General in their briefs. Further, on remand, the commission also discredited them. Judge Harrison was likewise unpersuaded by those exhibits. He wrote, in part:

"Edison relies upon Exhibits 7 and 8 to establish that the commission's order was prospectively unreasonable. The exhibits appear to be based on a 1976 projected year with certain adjustments. Edison concludes that this data, similarly used in the commission's U-5108 grant of interim relief, demonstrates the significant failure of Edison to achieve a reasonable rate of return in 1976 and the twelve months following the order. The court, however, is concerned as to the reliability of the data as it relates to the commission's final order. While demonstrating a revenue deficiency, there remain several significant outstanding challenges to the exhibits posed by the commission. Edison utilized, in part, Irwin's 1976 revenue projections. The commission rejected Irwin's 1976 test-year projection adopting instead a revised, partially projected 1975 test year. To this extent, Edison's exhibits do not directly address the unreasonableness of the revenue-deficiency calculations ultimately adopted by the commission.

"Moreover, while Edison's exhibits may reflect adjustments of the commission with regard to the Single Business Tax, depreciation rates, the 10 per cent purchase-power expense incentive, and the ordered rate increase, there remain several unaccounted-for, revenue-producing items used by the commission, such as the change in purchase-power and fuel-clause calculations, rate-design changes aimed at reducing peak load and slowing construction expense, and higher returns on common equity. In addition, the court finds the use of partial adjustments intended by the commission for its 1975 test year by Edison for its revised 1976 test year unacceptable. Although a 1976 test year was used in U-5108 in which interim relief was awarded, the comparison is inappropriate. The subsequent rate-making circumstances were undoubtedly different. Additionally, a later rate order is not determinative as to whether the preceding order was unlawful and unreasonable. *Michigan Bell Telephone Co v Public Service Comm,* 332 Mich 7, 43; 50 NW2d 826 (1952). the court finds Edison's Exhibits 7 and 8 to be unpersuasive."

## VII

Edison also argues that the commission erred in

the way in which it required the utility to write off or pay back to ratepayers deferred Michigan income taxes which no longer had to be paid when the corporate income tax was eliminated by the Single Business Tax Act, effective January 1, 1976. MCL 208.1 *et seq.;* MSA 7.558(1) *et seq.*

A part of Edison's past rates included amounts necessary to cover the state income tax when it was in effect. But, because Edison used accelerated depreciation for its federal income taxes, it was not required to pay the full state income tax each year; use of an accelerated depreciation deferred the payment of that tax. To account for its eventual liability for state income taxes, Edison set up a deferred income tax account, but in this rate case, the state income tax was to become obsolete on January 1, 1976, by the passage of the Single Business Tax Act. The question before the commission was how to deal with that deferred income tax account which was, at the time, in the amount of $20,813,000. In its final order, the commission required Edison to return its accumulated deferred Michigan income taxes to the ratepayers over a period of five years and did so by reducing Edison's presumed income by one-fifth of the accumulated reserve over five years (about $4,165,000 per year). In effect, since Edison would presumably have $4,000,000 or so in additional income each year, its rates could be set correspondingly lower.

In this issue, Edison disputes the commission's determination of the amount of the write-off. It argues that, if it had actually paid state income taxes, that amount would have been deductible from federal income taxes. Further, the company argues, since its federal corporate income tax rate was 48%, and it would have been allowed a deduc-

tion for state income taxes paid, the actual amount of its state income tax would be only 52% of the reserve or about $10,584,000. Only that amount should have been required to be written off. Because of the "gross up" required by the commission, Edison argues that it was required to give back nearly twice the amount of the accrued income taxes that it would have ordinarily been required to pay had the income tax remained in effect. Edison contends that the commission's action was especially unwarranted considering the utility's weak financial condition.

The utility's contention is rejected. It has not shown by clear and satisfactory evidence that the commission's decision is unreasonable or that it is unsupported by relevant, competent and material evidence on the whole record.

One fact stands out. It is undisputed that the actual amount of rates collected and deferred by the utility for future state income taxes was some $20,000,000. And it is undisputed that the utility did not have to pay that amount in taxes because of the repeal of the corporate income tax. Further, Edison could not claim a reduction of its state tax liability by the amount of the federal income tax deduction because the state income taxes would never be paid and the deduction never taken.

Finally, the case is controlled by our decision in *Michigan Bell Telephone Co v Public Service Comm*, 85 Mich App 163; 270 NW2d 546 (1978), *lv den* 405 Mich 822 (1979). There, the facts of an accumulated reserve for state income tax were the same, the commission's required method of writing off the reserve was the same, and Bell's argument on appeal to this Court was the same. We rejected it, saying:

"Money paid into the reserve had not yet been paid

as state income tax, and was, therefore, not deductible for Federal income tax purposes. Since the reserve was not deducted for Federal income tax purposes, Michigan Bell's argument that it was not necessary to collect nearly two dollars of revenue in order to accumulate one dollar of reserve is wrong. Nor does the fact that the reserve had not previously been counted as income for ratemaking purposes mean that it was not counted as income for Federal income tax purposes. Since Mr. Abbott's testimony was inconsistent with Michigan Bell's present theory, lifting Mr. Abbott's conclusions out of context and quoting them as establishing Michigan Bell's basic premise is misleading.

"Michigan Bell is not being required to 'refund' anything to ratepayers. Rather, the commission has determined that the rate increase sought by Michigan Bell need not be as large as Michigan Bell requested, because of the state income tax reserve windfall. The money which Michigan Bell claims it is 'refunding' to ratepayers already belongs to the ratepayers, and, absent a demonstration of error on the part of the commission, shall continue to belong to the ratepayers." 85 Mich App 172.


## VIII


Finally, Detroit Edison contends that the commission erred by disallowing a cost of service or operating expense deduction for $94,803 worth of charitable contributions the utility made to various Michigan and out-of-state educational institutions during 1974 and 1975, while at the same time allowing cost of service treatment to $220,000 worth of contributions to the Metropolitan Fund and the Urban Progress Fund (New Detroit Committee). No rational basis exists for allowing some contributions and disallowing others, Edison contends. Edison argues that deductibility of all charitable contributions as a business expense is consis-

tent with the Business Corporation Act (MCL 450.1261[k]; MSA 21.200[261][k]), the Internal Revenue Code and court decisions in other states. Edison urges this Court to adopt a corporate good will test and to recognize that charitable contributions aid the company in recruiting prospective employees, that they encourage educational programs that are related to industrial matters and that they fulfill a business obligation to the community.

The issue presents a novel question in Michigan.

The reason most frequently given for allowing cost of service treatment to charitable contributions is that the contributions allow the utility to establish corporate good will within its service area, thereby benefiting both the company and its customers. In addition, the amount of contributions is usually so small that its effect on rates is negligible. See, for example, *American Hoechest Corp v Dep't of Public Utilities,* 379 Mass 408; 399 NE2d 1 (1980); *New England Telephone & Telegraph Co v Dep't of Public Utilities,* 360 Mass 443; 275 NE2d 493 (1971); *Providence Gas Co v Burman,* 119 RI 78; 376 A2d 687 (1977); *United Transit Co v Nunes,* 99 RI 501; 209 A2d 215 (1965); 1 Priest, Principles of Public Utility Regulation, pp 83-87 (1969); Anno: *Charitable Contributions by Public Utility as Part of Operating Expense,* 59 ALR3d 941.

The opposite viewpoint is based on the belief that contributions to charity should be voluntary and should not be imposed as "forced contributions" or "involuntary levies" on ratepayers. See, for example, *City of Los Angeles v Public Utilities Comm,* 7 Cal 3d 331; 102 Cal Rptr 313; 497 P2d 785 (1972); *Washington Gas Light Co v Public Service Comm of District of Columbia,* 450 A2d

1187 (DC App, 1982); *New England Telephone & Telegraph Co v Public Utilities Comm,* 390 A2d 8 (Me, 1978); *Cleveland Electric Illuminating Co v Public Utilities Comm,* 69 Ohio St 2d 258; 431 NE2d 683 (1982); *State v Oklahoma Gas & Electric Co,* 436 P2d 887 (Okla, 1975); *Jewell v Washington Utilities & Transportation Comm,* 90 Wash 2d 775; 585 P2d 1167 (1978).

In this case, the commission disallowed an operating expense deduction for Edison's contributions to the educational institutions, saying:

"Since charitable contributions are purely discretionary, and are not necessary to provide electrical service, the commission relying in part on the recommendation of its staff has concluded that charitable contributions should ordinarily not be included as part of the 'cost of service' to ratepayers. Charging ratepayers for Edison's contributions amounts to taxing Edison's ratepayers for the benefit of Edison's favorite elemosynary institutions and projects.

"The commission's policy puts Edison in the same position as unregulated private enterprises. The policy is thus consistent with one major purpose of regulation, which is to insure so far as practical that Edison is in a similar position to enterprises in the competitive sector."

The commission wrote that its exception for New Detroit contributions was rationally distinguishable.

"The commission has discretionary authority to allow some charitable contributions and to disallow others. There remains a rational basis for allowing cost of service treatment to Edison's contributions to the successors of New Detroit. In contrast to the other charities and institutions supported by Edison, New Detroit has (and has previously had) a broad and salutary effect which has touched most and perhaps all of Edison's

ratepayers. The commission's allowances and disallowances in case No. U-4807 were therefore correct. The commission would not today allow cost of service treatment to contributions to educational institutions even if Edison recruited employees from the beneficiary institutions."

We agree that the commission has discretion to allow operating expense deductions for charitable contributions. We also hold that the commission expressed a rational basis for allowing the deductions to the Detroit charities while disallowing the others.

Ratemaking is a legislative function. *Pennwalt Corp v Public Service Comm,* 109 Mich App 542; 311 NW2d 423 (1981); *Detroit Edison Co v Public Service Comm,* 82 Mich App 59; 266 NW2d 665 (1978). The Legislature has delegated to the commission full discretionary authority to set just and reasonable rates. MCL 460.6; MSA 22.13(6). *Consumers Power Co v Public Service Comm,* 415 Mich 134; 327 NW2d 875 (1982); *Valentine v Michigan Bell Telephone Co,* 388 Mich 19; 199 NW2d 182 (1972). Determination of just and reasonable rates requires a determination of the reasonable costs of doing business. *General Telephone Co of Michigan v Public Service Comm,* 341 Mich 620; 67 NW2d 882 (1954). In making that determination, the commission has discretion to determine what charges and expenses to allow as costs of operation. *Michigan Bell Telephone Co v Public Service Comm,* 332 Mich 7; 50 NW2d 826 (1952). The decision to allow, or not, cost of service deductions for charitable contributions is, therefore, within the commission's discretion. *Accord, Washington Gas Light Co v Public Service Comm, supra; New England Telephone & Telegraph Co v*

*Public Utilities Comm,* 390 A2d 8 (Me, 1978); *State of North Carolina v Southern Bell Telephone & Telegraph Co,* 24 NC App 327; 210 SE2d 543 (1975). Edison has not shown that the commission abused its discretion.

The judgment of the circuit court is affirmed. No costs are awarded because the appeal involves issues of public importance.