NORTHERN MICHIGAN EXPLORATION COMPANY v PUBLIC
SERVICE COMMISSION

Docket No. 78273. Submitted June 11, 1985, at Lansing. Decided
August 4, 1986.

Northern Michigan Exploration Company owns one hundred
percent of the drilling rights in a drilling unit known as
Thompson I. Reef Petroleum Corporation and Empire National
Bank & Trust Company own royalty interests in the Thompson
unit which covers eighty acres. Northern Michigan Exploration
owns 41.66 percent of another unit known as Griner I, which
was later replaced by Griner II, located in a 120-acre site. Shell
Oil Company and others own the balance of Griners I and II.
Thompson I and Griners I and II are all drilled in the Cleon 22
Oil Field. Under the Michigan rule of ownership-in-place, each
owner of the surface is entitled only to his equitable and
ratable share of the recoverable oil and gas energy in the
common pool in the proportion which the recoverable reserves
underlying his land bears to the recoverable reserves in the
pool. Thompson I began producing natural gas in February,
1976, under a drilling permit issued in August, 1975. Since no
other well existed at Cleon 22, no proration was necessary and
Northern Michigan produced under a maximum allowable
withdrawal order. In October, 1976, the owners of Griner I sank
a well in Cleon 22 and obtained a drilling permit in December
of 1976. The well connection permit issued by the MPSC advised
Northern Michigan that, since a second well had been com-
pleted on the property, proration would be necessary and would
be retroactive to December 3, 1976, the date the permit applica-
tion was received by the commission. Griner I did not produce
well, however, and the owners shut it in and drilled Griner II
in July and August, 1978. By that time, Thompson was produc-
ing so much that the commission ordered it to reduce produc-
tion, but relented when Northern Michigan convinced it that
its parent, Consumers Power Company, was in dire need of

REFERENCES

Am Jur 2d, Administrative Law §§ 278 et seq.
Am Jur 2d, Gas and Oil § 161.
See the annotations in the Index to Annotations under Gas and Oil.

natural gas and that increased production was also necessary in order to overcome Northern Michigan's cash flow problems. In August, 1978, the commission again restricted Thompson's production, with another caution that proration would be necessary. The Cleon 22 reservoir was originally estimated to contain fourteen billion cubic feet of natural gas, but actually holds much less. By the time Griner II began production, the Thompson well had yielded 6,565,530 thousand cubic feet (Mcf), of which approximately 4,765,849 Mcf had been produced since Griner I began production. During its life, Griner I produced only 368,122 Mcf. Because Thompson was so far ahead of Griner in production, the commission commenced proration proceedings by notice of hearing June 28, 1979. The commission conducted hearings in 1979 and 1980 and a hearing officer issued his proposal for decision on December 9, 1980. The commission adopted the proposal by formal, forty-three-page decision and order issued June 29, 1982. The commission adopted a 90-10 net pay proration formula which gave ninety percent weight to acre-feet of net pay, that is, the estimated volume of recoverable natural gas, and ten percent weight to the wells' open-flow capacity. Plaintiffs, Northern Michigan Exploration, Reef Petroleum and Empire National Bank & Trust, appealed, alleging that the commission's order was erroneous because the 90-10 proration method used constituted the application of a policy which had not been promulgated as a rule under the Administrative Procedures Act and that the commission lacked jurisdiction to prorate natural gas production. The Ingham Circuit Court, Robert Holmes Bell, J., rejected both arguments and affirmed. Plaintiffs appealed. *Held:*

1. The Public Service Commission has jurisdiction to prorate production regardless of whether production exceeds demand or not.

2. The commission's use of the 90-10 formula was not outside its power and authority.

Affirmed.

1. GAS AND OIL — PRORATION OF PRODUCTION — PUBLIC SERVICE COMMISSION.

The Public Service Commission has jurisdiction to prorate the production of gas from a field regardless of whether or not production exceeds demand (MCL 483.105, 483.107, 483.108, 483.114; MSA 22.1315, 22.1317, 22.1318, 22.1324).

2. GAS AND OIL — PRORATION OF PRODUCTION — PUBLIC SERVICE COMMISSION.

The rules of the Public Service Commission authorize a number

of methods for proration of gas production from a field; proration based on modified open flow capacities is not the only permissible method (1979 AC, R 460.865[4]).

3. Gas and Oil — Proration of Production — Public Service Commission — Appeal.

Judicial review of a Public Service Commission order regulating oil or gas production is limited to determining whether the commission acted within the power and authority delegated to it.

4. Administrative Law — Administrative Procedures Act — Rule-Making Procedures.

The rule-making procedures requirements of the Administrative Procedures Act do not apply to a determination, decision or order in a contested case (MCL 24.207[f]; MSA 3.560[107][f]).

5. Administrative Law — Standards.

Standards may be set by an administrative agency pursuant to the rule-making provisions of the Administrative Procedures Act or through adjudication on a case-by-case basis.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Alan R. Dominick* and *Richard N. LaFlamme*), and *William H. Stephens III*, for plaintiff Northern Michigan Exploration Co.

*George G. Gronewald,* for plaintiffs Reef Petroleum Corporation and Empire National Bank and Trust Company.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Don L. Keskey* and *R. Philip Brown,* Assistant Attorneys General, for the Public Service Commission.

*Foster, Swift, Collins & Coey, P.C.* (by *David W. McKeague*), for Shell Oil Company.

*Lynch, Gallagher & Lynch* (by *Byron P. Gallagher*), for defendants Miller Brothers Oil Corporation, et al.

Before: MacKenzie, P.J., and Hood and J. E. Mies,* JJ.

J. E. Mies, J. This is an appeal as of right from an April 26, 1984, opinion and order of the Ingham Circuit Court which affirmed a June 29, 1982, natural gas well proration order by the Michigan Public Service Commission.

The controversy involves drilling rights in the Cleon 22 natural gas field which is located in the Salina-Niagaran reef in Cleon Township, Manistee County. Two drilling units own the oil and gas leases pertaining to Cleon 22. Both are operated by Northern Michigan Exploration Company, a wholly-owned subsidiary of Consumers Power Company. Northern Michigan is the one hundred percent owner of drilling rights in the Thompson I unit which covers eighty acres. The second unit, referred to as the Griner I, later replaced by Griner II, is owned 41.66 percent by Northern Michigan and the balance by intervening defendants. Griners I and II are located on a 120-acre parcel. Reef Petroleum Corporation and Empire National Bank and Trust Company own royalty interests in the Thompson unit.

Absent regulation, natural gas and oil are subject to the rule of capture under which, essentially, the first person to take them is entitled to them even though the well drains natural resources from under the land of another. See 8 Williams & Meyers, Oil and Gas Law, pp 782-784. In most American jurisdictions, the rule has been modified by the "fair share" or "ownership-in-place" rule. Michigan is an ownership-in-place state. *Manufacturers Nat'l Bank of Detroit v Dep't of Natural Resources,* 420 Mich 128, 141; 362 NW2d 572 (1984). Under the rule, "each owner of the surface

---

* Circuit judge, sitting on the Court of Appeals by assignment.

is entitled only to his equitable and ratable share of the recoverable oil and gas energy in the common pool in the proportion which the recoverable reserves underlying his land bears to the recoverable reserves in the pool." *Wronski v Sun Oil Co,* 89 Mich App 11, 22; 279 NW2d 564 (1979), quoting from 8 Nat Res Law 61, 64-65 (1975). "Fair share" is implemented by a number of procedures, including balancing, retroactive adjusting and proration. 8 Williams & Meyers, *supra,* pp 62, 695-697, 756. The proration which we are concerned about in this case is an allocation of the total production of gas from a common reservoir among the wells drilled into the reservoir.

Thompson I began producing natural gas in February, 1976, under a drilling permit issued in August, 1975. Since no other well existed at Cleon 22, no proration was necessary and Northern Michigan produced under a maximum allowable withdrawal order pursuant to MCL 483.107; MSA 22.1317. In October, 1976, the owners of Griner I sank a well in Cleon 22 and obtained a drilling permit in December of 1976. The well connection permit issued by the MPSC advised Northern Michigan that, since a second well had been completed on the property, proration would be necessary and would be retroactive to December 3, 1976, the date the permit application was received by the commission. Griner I did not produce well, however, and the owners shut it in and drilled Griner II in July and August, 1978. By that time, Thompson was producing so much that the commission ordered it to reduce production, but relented when Northern Michigan convinced it that its parent, Consumers Power Company, was in dire need of natural gas and that increased production was also necessary in order to overcome Northern Michigan's cash flow problems. In August, 1978, the

commission again restricted Thompson's production, with another caution that proration would be necessary.

The Cleon 22 reservoir was originally estimated to contain fourteen billion cubic feet (Bcf) of natural gas; but the Cleon 22 field holds much less. By the time Griner II began production, the Thompson well had yielded 6,565,530 Mcf, of which approximately 4,765,849 Mcf had been produced since Griner I began production. During its life, Griner I produced only 368,122 Mcf. Because Thompson was so far ahead of Griner in production, the commission commenced proration proceedings by notice of hearing June 28, 1979. The proceedings became known as Commission Case No. U-970 (Cleon 22). The commission conducted hearings in 1979 and 1980 and a hearing officer issued his proposal for decision on December 9, 1980. The commission adopted the proposal by a formal, forty-three-page decision and order issued June 29, 1982. The commission adopted a 90-10 net pay proration formula which gave ninety percent weight to acre-feet of net pay, that is, the estimated volume of recoverable natural gas, and ten percent weight to the wells' open flow capacity. The commission ordered:

> h. Field index ratings, the percentage of gas which is to be produced from a producing unit in relation to the pool production in excess of a minimum allowable take, are 42.32% for the Thompson well and 57.68% for the Griner 1 well for production from December 3, 1976 to September 8, 1978, and 38.84% for the Thompson and 61.16% for the Griner 2 for all production after September 8, 1982, according to application of the 90-10 net pay formula.

On appeal to circuit court, plaintiffs contended

that the commission's order was erroneous because the 90-10 proration method used constituted the application of a policy which had not been promulgated as a rule under § 33 of the Administrative Procedures Act, MCL 24.233; MSA 3.560(133), and that the commission lacked jurisdiction to prorate natural gas production. (Those are the same issues plaintiffs raise in this appeal.)

In its April 26, 1984, opinion, the circuit court rejected both arguments. The judge concluded that the commission had not blindly adopted the 90-10 proration method simply as a matter of policy, but that it applied it only after consideration of evidence suggesting that the Cleon 22 field was not a typical Salina-Niagaran reef. With regard to jurisdiction, the court concluded that "the Commission does have jurisdiction to prorate natural gas production, even when production does not exceed market demands. Such authority is to be found in section 5, 7, and/or 14 of Act 9 [of 1929; MCL 483.101 *et seq.;* MSA 22.1311 *et seq.*]."

Plaintiffs first argue that the Michigan Public Service Commission lacks jurisdiction to prorate production because there was no allegation or showing that production exceeded demand. When production does not exceed demand, plaintiffs contend, proration is exclusively within the jurisdiction of the Department of Natural Resources.

Two statutes are principally involved in this case. One is 1929 PA 9; MCL 483.101 *et seq.;* MSA 22.1311 *et seq.,* which places control and regulation of natural gas lines within the jurisdiction of the Michigan Public Service Commission. The other statute is the statute dealing with the conservation of oil and gas, 1939 PA 61; MCL 319.1 *et seq.;* MSA 13.139(1) *et seq.,* as amended by 1973 PA 61. Generally, plaintiffs say, the statutory scheme is to make the Department of Natural

Resources, and its director, the Supervisor of Wells, responsible for gas and oil in the ground, whereas transportation of natural gas, once it is out of the ground, is within the jurisdiction of the Public Service Commission. In this case, the Department of Natural Resources relinquished jurisdiction once it determined that Cleon 22 was a gas well, pursuant to a long-standing voluntary sharing of responsibility between the agencies.

Plaintiffs contend that § 8 of 1929 PA 9; MCL 483.108; MSA 22.1318, is the sole authority for proration by the MPSC, but that proration under this section is limited to the situation "[w]henever the full production of any common source or field of supply of natural gas in this state is in excess of the market demands." Plaintiffs contend that this is not properly proration per se but only a conservation measure. Here, plaintiffs argue, there was no allegation or showing below that production exceeded demand and, hence, the MPSC lacked jurisdiction to enter a proration order.

By contrast, plaintiffs argue, 1939 PA 61, and in particular §§ 12 and 13, explicitly give to the Department of Natural Resources sole authority to prorate in other situations. Plaintiffs emphasize that § 24 of 1939 PA 61, as amended in 1973, resolves any doubt about proration jurisdiction. That section provides:

> This act shall be cumulative of all existing laws on the subject matter, but, in case of conflict, this act shall control and shall repeal such conflicting provisions, *except for the authority given the public service commission in sections 7 and 8 of Act No. 9 of the Public Acts of 1929 as amended* . . . . [MCL 319.24; MSA 13.139(24). Emphasis added.]

That means, plaintiffs argue, that the MPSC's sole proration authority comes under §§ 7 and 8 of

1929 PA 9, but that proration authority is limited to setting maximum daily flows and prorating in cases where production exceeds demand. Since that was not the case here, plaintiffs conclude, the MPSC had no jurisdiction to prorate. Proration jurisdiction was exclusively with the Department of Natural Resources under 1939 PA 61, particularly, §§ 12 and 13.

Our resolution of the jurisdictional question is made difficult by a confusing history of conflicting and overlapping legislation. 1929 PA 9; MCL 483.101 *et seq.;* MSA 22.1311 *et seq.,* generally regulates the carrying and transporting of natural gas through pipelines. That legislation was followed by 1937 PA 326 which gave to the Supervisor of Wells in the Commission of Conservation, the predecessor of the Department of Natural Resources, "entire jurisdiction over the matter of conservation of natural dry gas in the state of Michigan, except for the authority given to the" Public Service Commission under 1929 PA 9. 1937 PA 326, § 13. That legislation, in turn, was followed by 1939 PA 61 which gave to the Supervisor of Wells jurisdiction over all matters concerning the conservation of oil and gas in this state. MCL 319.1 *et seq.;* MSA 13.139(1) *et seq.* Then came 1973 PA 61 which amended 1939 PA 61 and repealed 1937 PA 326. The 1973 act is a rough consolidation of provisions from the 1937 and 1939 acts.

The problem with the surviving legislation, 1929 PA 9 and 1939 PA 61, as amended by the 1973 act, is that the legislation gives jurisdiction to control production of natural gas, and, specifically, to prorate production, both to the Public Service Commission and to the Department of Natural Resources. For example, the title of 1929 PA 9 includes an intent "to regulate the *production,*

purchase and sale of natural gas." (Emphasis added.) Section 5 of the act empowers the Public Service Commission "to make regulations for the equitable purchasing, taking and collecting of all such gas . . . ." MCL 483.105; MSA 22.1315. Section 7 limits production in gas fields, except that the commission can establish higher or lower percentage production under its rules and regulations. MCL 483.107; MSA 22.1317. Section 8 of the act empowers the commission to prorate production "[w]henever the full production from any common source or field of supply of natural gas in this state is in excess of the market demands." MCL 483.108; MSA 22.1318. Finally, § 14 of that act gives the commission authority to prevent waste in natural gas production operations and empowers the commission to "do all things necessary for the conservation of natural gas in connection with the *production,* piping and distribution thereof . . . ." MCL 483.114; MSA 22.1324. (Emphasis added.)

The Department of Natural Resources is also given authority to prorate production of gas wells by 1939 PA 61, as amended by 1973 PA 61. Thus, for example, §§ 4 and 5 of the act give the Supervisor of Wells jurisdiction and authority to prevent waste in the production of oil and gas and "jurisdiction and control of and over all persons and things necessary or proper to enforce effectively the provisions of this act and all matters relating to the prevention of waste and the conservation of oil and gas." MCL 319.5; MSA 13.139(5). One of the supervisor's specifically-enumerated duties under § 6(j) is to "fix the spacing of wells and *to regulate the production therefrom."* MCL 319.6(j); MSA 13.139(6)(j). (Emphasis added.) Under § 12, the supervisor is empowered to "allocate or distribute the allowable production in any such field or pool." MCL 319.12; MSA 13.139(12). Under § 13,

the supervisor is given specific authority to prorate the allowable production among the producing wells in a field or pool. MCL 319.13; MSA 13.139(13). That section also allows the supervisor to set minimum allowables and allowable production for wells and pools. Finally, § 24 declares that, "[t]his act shall be cumulative of all existing laws on the subject matter, but, in case of conflict, this act shall control and shall repeal such conflicting provisions, except for the authority given to the public service commission in sections 7 and 8 of [1929 PA 9]." MCL 319.24; MSA 13.139(24).

Because 1929 PA 9, §§ 5, 7, 8 and 14 give the Public Service Commission jurisdiction to control natural gas production, we reject plaintiffs' contention on appeal that the commission lacks jurisdiction to prorate production. We are especially reluctant to disturb the commission's exercise of jurisdiction in this regard in view of the fact that, for more than fifty years, the commission and the Department of Natural Resources have interpreted the statutes to give the commission jurisdiction to prorate production. The transfer of jurisdiction between the two agencies is a matter of long-standing administrative interpretation of the cumulative nature of 1929 PA 9 and 1939 PA 61. That long-standing interpretation is to be given respectful consideration by the courts. *Margreta v Ambassador Steel Co,* 380 Mich 513; 158 NW2d 473 (1968). Besides, 1929 PA 9 has remained intact for fifty-seven years without amendment and the Legislature is presumed to have known of the agency interpretation when it amended the DNR's legislation in 1939 and again in 1973. Hence, the Legislature must have known each time it amended 1939 PA 61 that the DNR traditionally transferred jurisdiction to the commission to prorate production from gas wells. The Legislature did not choose to

require a different interpretation. In fact, the Legislature has specifically rejected proposals over the years that would have divested the commission of proration jurisdiction. For example, Senate Bill No. 243, introduced at the 1937 session of the Legislature, proposed repeal of §§ 5, 7 and 8 of 1929 PA 9 which now give the commission authority to prorate production. In 1979, Senate Bill No. 473 proposed to transfer all control of gas production and proration to the Supervisor of Wells.

Finally, the Supreme Court said of 1929 PA 9 in *Nelson v Galpin,* 277 Mich 529, 541; 269 NW 586 (1936), that "the statute in question is not prohibitory, but, by the very language of its title and by its terms, is regulatory of the *production,* purchase and sale of natural gas and of those engaged in the business of carrying and transporting it through pipelines." (Emphasis added.) Again, in *Wolverine Natural Gas Corp v Consumers Power Co,* 296 Mich 500, 506; 296 NW 660 (1941), the Supreme Court said, "[t]he statute in question is regulatory of the *production,* purchase and sale of natural gas, and of those engaged in the business. One of its purposes is to permit equitable withdrawal of gas by those interested in the common source or field of supply, for purposes of conservation, and to restrict the daily flow or output to that end." (Emphasis added.) Based on the above, we hold that the Public Service Commission had jurisdiction to render the natural gas proration order that it entered in this case.

Plaintiffs also argue that the commission, in adopting the 90-10 proration formula, applied a policy which the commission first adopted in Case No. U-970 (Grant 13), issued on July 31, 1979. Since the commission adopted the 90-10 proration formula as policy, plaintiffs argue, the formula violates the rule-making provisions of the Admin-

istrative Procedures Act of 1969 because "rule" under that statute includes "an agency regulation, statement, standard, policy, ruling or instruction of general applicability, which implements or applies law enforced or administered by the agency . . . ." MCL 24.207; MSA 3.560(107). Plaintiffs contend that administrative agencies cannot rely on unpromulgated policies.

Plaintiffs also contend that the commission similarly acted outside of the rule-making procedures of the APA by using cumulative balancing, retroactivity and transfer of underproduction simply as matters of policy, without the authority of properly-promulgated rules.

Finally, plaintiffs argue that the commission is required to adopt rules and regulations by MCL 483.105; MSA 22.1315 and that the rule the commission adopted, Rule 15(4); 1979 AC, R 460.865(4), is inadequate to cover the 90-10 formula because the only proration method authorized by that rule is the "modified open flow capacities or any other method determined by the commission" standard. Plaintiffs argue that the phrase "any other method" is not sufficiently precise.

We reject the arguments.

Commission Rule 15(4) specifically provides for proration by a number of means. 1979 AC, R 460.865(4) provides:

> Ratable taking or gas proration: All gas produced from a field or pool in excess of the minimum allowable provided for in subrule (3) shall be taken ratably from all wells that are capable of producing more than their minimum allowable take. Such excess shall be divided among such wells in proportion to their modified open flow capacities *or any other method determined by the commission to be equitable or less wasteful,* except that in no case shall the total gas taken from a

well be larger than provided for in subrule (1). [Emphasis added.]

The "modified open flow" formula is more particularly described in Rule 2(j); 1979 AC, R 460.852(j). More specific rules, defining other proration methods, were not necessary. Proration methods, including the modified open flow method, are common to the oil and gas industry and are well-known. They are "descriptive language peculiar to the natural gas industry." *Wolverine Natural Gas Corp v Consumers Power Co, supra,* 296 Mich 502. Included in the common methods are per well allocation plus acreage factor formulas such as the 90-10 formula adopted by the commission in this case. Williams & Meyers define "proration formula" as:

> The basis on which the field ALLOWABLE (*q.v.*) is allocated to the wells in the field. These formulae vary considerably in the factors given weight: some allocate production on a per well basis only; some on a combination of per well allocation plus an acreage factor (see 50-50 ALLOWABLE FORMULA); some include acre feet of formation, bottom hole pressure, potential, well depth, and expense of drilling [8 Williams & Meyers, *supra,* p 695.]

Generally, oil and gas regulatory bodies have broad discretion to establish allowable production (allowables) and court review is limited.

> It may be stated as a general proposition of law that the determination of market demand and establishing allowables is a responsibility which the legislature has lodged in the Commission. The courts are without jurisdiction to determine the method the Commission should use or the factors which it should consider. The courts may examine the methods used for the purpose of determining

whether the Commission has acted within the power and authority delegated to it by the legislature. [*Colorado Interstate Gas Co v State Corporation Comm,* 192 Kan 1, 18; 386 P2d 266 (1963).]

Our jurisdiction is limited to determining whether the commission acted within the power and authority delegated to it by the Legislature. The Legislature has authorized the commission to prorate gas production on a just and equitable basis in the proportion that the total recoverable gas bears to the recoverable gas under each property. MCL 483.108; MSA 22.1318. The commission, through its rule-making authority (MCL 483.105; MSA 22.1315), has adopted a proration method that is equitable—a proration method that is generally recognized in the oil and gas industry.

The formula is upheld also on the further ground that the rule-making requirement of the APA does not apply to "[a] determination, decision or order in a contested case." MCL 24.207(f); MSA 3.560(107)(f).

Finally plaintiffs' contention must be rejected because it is settled that an agency has the option of setting standards either pursuant to the rule-making provisions of the APA or case by case through adjudication. See, for example, *American Way Life Ins Co v Ins Comm'r,* 131 Mich App 1; 345 NW2d 634 (1983), lv den 419 Mich 937 (1984); *DAIIE v Comm'r of Ins,* 119 Mich App 113; 326 NW2d 444 (1982); *Michigan Life Ins Co v Ins Comm'r,* 120 Mich App 552; 328 NW2d 82 (1982).

The commission's adoption of the 90-10 proration formula in this case is analogous to the commission's adoption of a forty-five-day formula for determining working capital allowance in *Attorney General v Public Service Comm #2,* 136 Mich App 515, 522-523; 358 NW2d 351 (1984). There, the

Public Service Commission determined Detroit Edison's rate base by combining net utility plant with a formula-determined working capital allowance, the forty-five-day formula. The Attorney General contended that a different formula should have been used, but we held there was no error.

> In adopting the 45-day formula for establishing Edison's working capital allowance, the commission was simply following accepted utility rate-making practice and its own practice in past cases. . . .
>
> *          *          *
>
> The commission had discretion to employ the 45-day formula for determining the working capital allowance. It was not obligated to adopt the Attorney General's proposed actual investment rate base. Ratemaking is a legislative function. The Legislature has delegated to the Public Service Commission discretionary authority to set just and reasonable rates. *The Detroit Edison Co v Public Service Comm, supra,* 127 Mich App 499, 524 [342 NW2d 273 (1983)]. In setting rates, the commission is not bound by any single ratemaking formula.

The same rationale can be used to uphold the commission's authority to require cumulative balancing, to control production retroactively and to transfer underproduction. These are common devices in the industry to assure that each interest owner obtains a fair and equitable share of production. See 8 Williams & Meyers, *supra,* "Balancing," pp 62-63; "Retroactive Adjusting Allowable," p 756; "Transferred Allowable," p 919; "Underproduction," p 933 and "Overproduction," p 606; see, also, 38 Am Jur 2d, Gas and Oil, § 161, pp 641-644. Again, as in the case of the 90-10 proration, specific rules and regulations are not necessary to authorize these types of production adjustments

since they are common regulatory devices in the industry and within the "any other method determined by the commission to be equitable or less wasteful" provision of Rule 15(4); 1979 AC, R 460.865(4).

The decision of the circuit court is affirmed. Costs on appeal are denied because the appeal involves questions of public significance.