CONSUMERS POWER COMPANY v PUBLIC SERVICE COMMISSION

Docket No. 184218. Submitted October 9, 1996, at Lansing. Decided October 17, 1997, at 9:05 A.M. Leave to appeal sought.

Consumers Power Company filed an application with the Public Service Commission for the approval of a contract between Consumers Power and James River Corporation providing for the transportation by Consumers Power of natural gas to various James River facilities at prices set at the T-1, or fixed rate, tariff previously approved by the commission and below the T-2, or variable rate, tariff also previously approved by the commission. James River had considered switching to a pipeline system operated by Panhandle Eastern Pipeline Corporation. The commission allowed James River and the Attorney General to intervene and ultimately issued an order approving the special discount rate contract, subject to the condition that any shortfall in Consumers Power revenues caused by the difference between the contract rate and the lowest rate allowed under the T-2 tariff could not be recovered from the other customers of Consumers Power by way of increases in the general rates at which those customers are charged. Consumers Power appealed.

The Court of Appeals *held*:

1. Contrary to the contention of the Attorney General and the commission's staff, Consumers Power has standing to appeal the order of the commission. Although the special discount rate contract was approved by the commission, the commission's imposition of an unsolicited condition, prohibiting Consumers from recovering from its other customers any resulting revenue shortfall caused by the contract rates below the minimum T-2 rate, adversely affects the pecuniary interests of Consumers Power. Consumers Power also did not have to wait for the final decision of the commission in the then-pending general rate case of Consumers Power; the time for challenging conditions imposed by the commission is in an appeal from the order imposing the condition, not later orders of the commission that merely enforce the condition. The interests of Consumers Power were adversely affected, so as to confer Consumers Power with standing to challenge the commission's order, when the commission, on its own initiative and without the urging of Consumers Power, addressed issues involving

general rates charged to, and cost recovery from, the other customers of Consumers Power.

2. The commission, in approving the contract, made no judgment about the reasonableness and prudence of Consumers Power's decision to grant special rates to James River. Accordingly, Consumers Power cannot argue that the commission, in preventing Consumers Power from recovering from its other customers any revenue shortfalls caused by the special rates granted to James River, has unconstitutionally taken property without due process by disallowing Consumers Power from recovering reasonable costs associated with a reasonable and prudent business decision. There was nothing inherently unlawful or unconstitutional about the prohibition against recovery of revenue shortfalls from the other customers. The commission was under no legal obligation to allow Consumers Power to charge James River any special discount rates below the approved tariff rates, and the commission lawfully could have required Consumers Power to charge the tariff rate at the risk of losing James River's business altogether. The commission did not make the exercise of its regulatory authority to approve the contract conditional upon Consumers Power giving up its constitutional right to fully recover its reasonable costs.

3. The commission's decision did not constitute an arbitrary and unconstitutional change in ratemaking methods. Consumers Power cannot rely on a rate case involving Michigan Consolidated Gas Company in which the commission allowed an adjustment to MichCon's projected transportation sales volume in order to allow the utility to recover revenues lost when a customer left the utility's system. The MichCon case and this case are different inasmuch as Consumers Power did not lose James River as a customer.

4. The decision of the commission is not illogical, unreasonable, arbitrary, or capricious, and does not constitute an abuse of discretion. The commission has authority to mandate adherence to established tariff rates, to disallow any special discount rates, and to allow special rates on the condition that all, or a portion of, resulting shortfalls in revenue not be recovered from other customers.

Affirmed.

1. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — RATEMAKING AUTHORITY — JUDICIAL REVIEW.

The Court of Appeals in reviewing an exercise of the ratemaking authority of the Public Service Commission accords deference to the administrative expertise and judgment of the commission absent some breach of a constitutional standard or statutory mandate or limitation.

2. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — NATURAL GAS TRANSPOR-
   TATION TARIFFS — DISCOUNTS.

    The Public Service Commission has authority to mandate adherence
   to tariff rates previously approved by the commission for the trans-
   portation of natural gas or to allow special discount rates; in
   allowing a special discount rate, the commission, consistent with
   its authority to prevent discriminatory rates, cross-customer subsi-
   dization, and ratepayer subsidization of business risks, may prevent
   the entity providing the transportation from recovering from its
   other customers' shortfalls in revenue caused by the discount.

*David A. Mikelonis, Jon R. Robinson,* and *Kelly M. Hall,* for Consumers Power Company.

*Don L. Keskey* and *Sharon L. Feldman,* Assistant Attorneys General, for the Public Service Commission.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *J. Peter Lark* and *Robert L. Mol,* Assistant Attorneys General, for the Attorney General.

Before: YOUNG, P.J., and MARKEY and D. A. TEEPLE*, JJ.

YOUNG, P.J. Consumers Power Company appeals as of right a decision of the Michigan Public Service Commission (PSC) approving a special discount rate contract between Consumers and James River Corporation for transportation of natural gas, subject to the proviso that any revenue shortfall created by the difference between the special contract rate and the lowest rate allowed under the PSC gas transportation rate tariffs may not be recovered from Consumers' other customers. We affirm.

---

\* Circuit judge, sitting on the Court of Appeals by assignment.

I

In 1989, the PSC established two tariffs for Consumers' gas transportation services, known as T-1 and T-2. The T-1 tariff specifies a fixed rate. At the time of the proceedings in this case, the T-1 rate was $0.4734 a Mcf.[1] The T-2 tariff provides a range of rates extending above and below the T-1 fixed rate. At the time of the proceedings in this case, that range was between $0.7101 and $0.2367 a Mcf. In other words, the "floor" or lowest rate allowed by the PSC's tariffs was $0.2367 a Mcf. The PSC's decision establishing those gas transportation tariffs was upheld by this Court in *Midland Cogeneration Venture Ltd Partnership v Public Service Comm*, 199 Mich App 286; 501 NW2d 573 (1993).

James River is one of Consumers' largest gas transportation customers. Two of James River's four plants in the Kalamazoo area constitute the first and sixth largest users of natural gas connected to Consumers' gas transportation system, accounting for nearly 4 Bcf[2] of gas transported each year. However, those facilities are located within a few miles of a competing interstate gas pipeline operated by Panhandle Eastern Pipeline Corporation.

In 1993, James River announced that it was considering bypassing Consumers' gas system by connecting directly to Panhandle's interstate pipeline. Contract negotiations ensued between Consumers and James River to determine the kind of discounts necessary to persuade James River to remain on Consumers' system. These negotiations focused upon the expected

---

[1] Mcf = Thousand cubic feet.

[2] Bcf = Billion cubic feet.

cost of connecting James River's facilities to the Panhandle pipeline, as well as the availability of discounted gas services from both Panhandle and Trunkline Gas Company, another interstate pipeline.

Ultimately, on June 28, 1994, Consumers offered James River a five-year contract providing special discount gas transportation rates below the lowest T-2 rate established by the PSC. Specifically, the contract provided a rate of $0.15 a Mcf for years one through three and a rate of $0.18 a Mcf for years four and five for the two larger James River facilities in the Kalamazoo area, while the company's two smaller facilities would continue to pay the fixed T-1 rate established by the PSC. According to the contract, James River's minimum annual gas consumption would be 4 Bcf for years one through three and 2 Bcf for years four and five. Additionally, James River would be exempt from any new rate surcharges implemented by the PSC during the contract term over and above the surcharges already in place.

After further negotiations, James River accepted Consumers' special contract offer, subject to approval by the PSC within the next six months. In a June 30, 1994, letter agreement, Consumers agreed to assume certain additional obligations in the event that the PSC did not approve the contract within the six-month deadline. Those obligations included arranging for a third party to construct a bypass pipeline for James River and paying liquidated damages to James River in the amount of the difference between the existing transportation rate and the discount contract rate. According to Consumers, these additional obligations were demanded by James River as a condition of its acceptance of Consumers' contract offer, in light of

the fact that James River had to notify its bypass developer by July 1, 1994, whether James River was willing to proceed with the bypass.

On August 5, 1994, Consumers filed an application with the PSC requesting ex parte approval of its discount rate contract with James River. The PSC declined to decide the matter on an ex parte basis and allowed James River and the Attorney General to intervene. All the parties agreed to expedite the proceedings by submitting the matter directly to the PSC on briefs, prefiled testimony, exhibits, and other evidence presented at an administrative hearing on February 1 and 2, 1995, dispensing with the usual procedure of having the hearing officer issue a preliminary proposal for decision.

Consumers' witnesses testified that the annual revenues received under the discount contract would be sufficient to cover all the variable costs associated with continuing to provide transportation service to James River, with some surplus revenue left over to defray Consumers' fixed costs as well. Specifically, Consumers estimated minimum annual revenues of $600,000 in years one through three, with $425,800 of variable costs each year, leaving $174,200 annually for contribution to Consumers' fixed costs. Depending upon whether James Rivers' annual consumption remained at 4 Bcf or dropped to the 2 Bcf minimum for years four and five, Consumers expected to collect between $120,200 and $294,200 in excess of the variable costs of serving James River in the last two years of the contract. In contrast, Consumers stood to lose nearly $925,000 in annual revenue if James River chose to bypass Consumers' system, leaving all of Consumers' fixed costs to be recovered by revenues

from Consumers' remaining customers. As for the costs to James River, Consumers estimated that, through 1999, James River would have $61,653,823 in total gas costs if it bypassed Consumers' gas system, the discount rate contract with Consumers would cost James River $62,747,122, and the T-2 "floor" tariff rate would cost James River $64,177,670. In other words, under the discount contract Consumers would be losing approximately $1.5 million over five years as a result of charging James River rates lower than the lowest T-2 rate, but James River would also be losing approximately $1 million in savings it might have obtained by bypassing Consumers' system.

Consumers' maintained that as long as the discount contract rates are sufficient to cover the variable costs of providing transportation service to James River and to make at least some additional contribution to Consumers' fixed costs, the utility and its other customers are better off with the discount contract than without it, and therefore the contract should be approved. Consumers did not ask the PSC to decide at that time whether Consumers could recover from its other ratepayers the revenue shortfall that would result from charging the discount rate in its special contract with James River. Rather, Consumers maintained that any ratemaking treatment issues should be decided in future rate cases. In contrast, the Attorney General and the PSC staff argued against approval of the discount contract and urged the PSC to address the ratemaking effect upon Consumers' other customers in the event the PSC decided to approve the contract.

In an opinion and order issued on February 23, 1995, the PSC approved Consumers' special contract

with James River, finding that discount rates are necessary to induce James River to remain a customer on Consumers' system and that the discount rates of the negotiated contract are sufficient to pay the variable costs of serving James River as well as to help defray the fixed costs of Consumers' system:

> Based on the record and arguments of the parties, the Commission concludes that the contract should be approved. There is an adequate evidentiary basis to conclude that James River has an economic bypass alternative and that the special contract rates are necessary to induce it to remain as a customer on Consumers' system. There is also an adequate evidentiary basis to conclude that the rates in the special contract will cover the variable costs of serving James River and will provide a contribution to system fixed costs. Consumers' management considered these factors and decided to enter into the special contract as the best deal that could be obtained for the utility. The Commission therefore approves the resulting contract.

However, the PSC also clarified that its approval of Consumers' special contract was conditioned upon the utility assuming full responsibility for any revenue shortfall between the contract price and the T-2 rate floor. This meant that Consumers could only seek to recover in its general rates any difference between the T-2 rate floor and Consumers' actual transportation class cost of service and that any difference between the T-2 rate floor and the James River contract rate could not be recovered from Consumers' other ratepayers:

> Consistent with its view that Consumers' management should be permitted to enter into this special contract, the Commission also believes, as a general matter, that the utility should assume full responsibility for negotiating the discounted prices and that its shareholders should expect to

absorb much, if not all, of any revenue shortfall caused by the pricing and other contract terms that the utility negotiates. In this case, the Commission has determined that approval of the contract depends on the revenue shortfall created by the difference between the contract price and the Rate T-2 floor being the responsibility of Consumers' shareholders and prohibiting the company from seeking to recover that amount from other customers. The treatment of the potential revenue shortfall created by the difference between the Rate T-2 floor and the transportation class cost of service will be addressed and resolved in the pending general rate case, where that revenue shortfall is already at issue.

On the other hand, the PSC also rejected arguments against allowing any discount rates below the T-2 rate floor:

The Commission is not committed to a policy that transportation may occur only on Rate T-1 or Rate T-2, rather than pursuant to special contracts, particularly when the discount offered by Consumers to James River differs only in size, not character, from the discount already offered to Rate T-2 customers. For customers in unique circumstances, it may be necessary to be more flexible than Rate T-2 permits and, in the long-run, Consumers may find it necessary to offer further discounted prices to retain those customers on the system. At least initially, it is for Consumers' management to decide whether to pursue that course of action and to accept the risk that the contribution to fixed costs is inconsequential, although the Commission retains the authority to decide the ratemaking effects of the company's chosen course. In this case, the Commission cannot conclude that approval of the special contract will have any measurable effect on Consumers' financial viability, even if its shareholders are ultimately required to bear the entire discount that Consumers' management granted to James River. Finally, it does not appear that Consumers will be required to expend any large sums to serve new custom-

ers in the Kalamazoo area, even if James River remains a customer.

II .

On appeal, Consumers has the burden of proving by clear and satisfactory evidence that the PSC's decision is unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8), MCL 462.25; MSA 22.44; *Antrim Resources v Public Service Comm,* 179 Mich App 603, 619-620; 446 NW2d 515 (1989). In general, a decision of the PSC is unlawful when it involves an erroneous interpretation or application of law and unreasonable when it is unsupported by the evidence. *Attorney General v Public Service Comm,* 165 Mich App 230, 235; 418 NW2d 660 (1987). Ordinarily, any factual determinations made by the PSC must be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28. However, when the PSC exercises its "legislative" ratemaking authority, rather than acting in a judicial or quasi-judicial adjudicative capacity, this Court does not apply the substantial evidence test, but accords deference to the administrative expertise and judgment of the PSC absent some breach of a constitutional standard or statutory mandate or limitation. *Ass'n of Businesses Advocating Tariff Equity v Public Service Comm,* 205 Mich App 383, 390; 522 NW2d 140 (1994).

III

As an initial matter, we address the arguments by the Attorney General and the PSC (hereinafter "appellees") that Consumers lacks standing to appeal the PSC's order in this case because it is not presently injured or aggrieved by the PSC's order. In this regard,

appellees note that the PSC's February 23, 1995, order had no immediate effect upon Consumers' rates, which were yet to be determined in Consumers' then-pending general rate case and that the order actually granted Consumers the contract approval it requested. Appellees also stress the fact that the PSC did not require Consumers to provide James River with the discount rate and that it was Consumers' own voluntary decision to enter into a discount contract with James River and to proceed under the terms of that contract after the PSC gave its conditional approval on February 23, 1995. Appellees note that Consumers' business benefits as a result of being able to keep James River as a customer. They also note that Consumers also benefits from the PSC's decision in that Consumers is able to avoid substantial remunerative obligations to James River under the June 30, 1994, letter agreement that would have arisen if the PSC did not approve the special discount contract, as well as potential sanctions against Consumers if it were to attempt to fulfill some of those obligations.

We find appellees' challenge to Consumers' standing to appeal unpersuasive. While the PSC's conditional approval of Consumers' proposed special contract with James River may have benefited Consumers in several respects, the PSC's imposition of an unsolicited condition upon its approval, prohibiting Consumers from recovering from its other customers any resulting revenue shortfall below the T-2 rate floor, adversely affects Consumers' pecuniary interests by foreclosing Consumers from recovering a portion of its costs of service in its general rates. Thus, while Consumers may have voluntarily chosen to pro-

ceed with the special discount contract after the PSC's decision, in order to reap the benefits of those aspects of the PSC's order it does not challenge, this does not necessarily mean that Consumers has also voluntarily accepted the PSC's challenged condition as well. Nor was Consumers required to await the PSC's final decision in Consumers' general rate case before challenging the PSC's conditional approval on appeal. Indeed, this Court has indicated that the time for challenging conditions imposed by the PSC is in an appeal from the order imposing the condition, not later orders of the PSC that merely enforce the condition. See *CMS Energy Corp v Attorney General*, 190 Mich App 220, 227-228; 475 NW2d 451 (1991).

Appellees also argue that Consumers waived rate recovery issues and any objections to the PSC's failure to comply with the usual procedural requirements for a contested case administrative hearing by urging the PSC to approve the special discount contract on an expedited basis, without a preliminary proposal for decision or even a reading of the evidentiary record, and by arguing to the PSC that such approval will not require pass through of any unrecovered costs to Consumers' other customers. However, these arguments overlook the fact that Consumers made its representations to the PSC in the context of urging the PSC to rule only on the narrow issue whether the special discount contract should be approved, while leaving issues of ratemaking treatment and recovery from other customers to be decided in the future. Because the PSC did not abide by Consumers' request, but addressed ratemaking treatment matters as well, at least with respect to the recovery of any revenue shortfall below the T-2 rate floor, we conclude that

Consumers' interests are affected by the PSC's ruling and that Consumers has standing to challenge that ruling. *Michigan Soft Drink Ass'n v Dep't of Treasury*, 206 Mich App 392; 522 NW2d 643 (1994).

IV

Consumers argues that the PSC's decision to require Consumers' shareholders to bear the revenue shortfall caused by the difference between the special contract discount rates and the T-2 floor rate is an unconstitutional taking of property without due process because it prevents Consumers from recovering in its rates all the reasonable costs of conducting its gas business. In this regard, Consumers contends the PSC found that Consumers' business decision to enter into the special contract with James River was a reasonable and prudent one, yet prohibited Consumers from recovering a considerable portion of the costs associated with that business decision, thereby denying Consumers its constitutional right to just, reasonable, and nonconfiscatory rates. We disagree.

The PSC's decision contains no finding that Consumers' decision to enter into the discount contract was a reasonable and prudent business decision, but at most, only a finding that the special contract rates are necessary to induce James River to remain as a customer on Consumers' system and that the special contract rates are sufficient to cover the variable costs of serving James River and provide at least some, arguably negligible, contribution to fixed system costs as well. The mere fact that the PSC allowed Consumers and James River to proceed with their contract is insufficient to constitute any express or implied determination that any of the costs associated

with keeping James River as a customer on Consumers' system are the kind of reasonable and necessary costs of doing business that may be charged to Consumers' other ratepayers, especially since the PSC specifically conditioned its approval of the special discount contract upon the proviso that some, if not all, of the resulting revenue shortfall must be borne solely by Consumers' shareholders. The PSC's approval of Consumers' decision to offer James River a special discount contract cannot be isolated from the proviso upon which the PSC stated that its approval was based. Moreover, even when the PSC does find that a particular business decision is reasonable and prudent, it does not necessarily follow that the PSC must also find all the costs associated with that decision reasonable and prudent as well. Cf. *Ass'n of Businesses Advocating Tariff Equity v Public Service Comm*, 208 Mich App 248, 265-267; 527 NW2d 533 (1994) (recovery allowed for some, but not all, costs associated with ultimately abandoned nuclear power plant project).

The reality of the situation is that the PSC did not actually reach the issues of the reasonableness and prudence of Consumers' decision in this case, but rather deferred consideration of that issue for Consumers' general rate case. The PSC did, however, foreclose Consumers from recovering a portion of the revenue shortfall that results from the discount rate by making a blanket ruling that all revenue shortfall below the T-2 rate floor are not costs that can be passed through to the utility's other ratepayers through its rates. We find nothing inherently unlawful or unconstitutional about that blanket prohibition. Indeed, the PSC was under no legal obligation to allow

Consumers to charge James River any special discount rates below the PSC's established transportation tariffs at all, and the PSC lawfully could have required Consumers to charge the tariff rate, at the risk of losing James River's business altogether. See *North Michigan Land & Oil Corp v Public Service Comm*, 211 Mich App 424, 432; 536 NW2d 259 (1995); *Midland Cogeneration Venture, supra* at 308-310.

Nor is it accurate to say that the PSC made the exercise of its regulatory authority to approve the discount rate conditional upon Consumers giving up its constitutional right to fully recover the reasonable costs of its gas transportation business. It is Consumers' own voluntary reduction of the rates charged to James River that creates the potential revenue shortfall impairing Consumers' ability to recover its fully allocated costs of that service, both fixed and variable. We find it not a little inconsistent for Consumers to seek on its own initiative the opportunity to relieve one of its customers of the responsibility of paying that customer's fully allocated costs of service, including fixed costs, and then to argue that its constitutional right to recover those costs of service has been unlawfully confiscated by the PSC's refusal to pass all of the relinquished cost responsibility on to Consumers' other customers. Recovering one's costs of business is one thing, but requiring one group of customers to bear the costs of service allocated to other customers is quite another.

This Court has previously upheld in *Midland Cogeneration Venture, supra,* the authority of the PSC to prevent cross-subsidization of customer classes through rates. In *Midland,* we upheld the PSC's imputation of "phantom" revenues to cover the amount of

revenue shortfall resulting from certain discounts associated with a special economic development rate known as Rate D. *Id.* at 319-322. While the situation in *Midland* was somewhat different because Consumers had stipulated from the outset that it would not recover any Rate D revenue shortfall from its other customers, the *Midland* case indicates that there is nothing inherently unconstitutional about denying recovery of revenue shortfalls created by voluntary establishment of discount rates for certain customers.

Consumers also contends that the PSC's decision in this case constitutes an arbitrary and unconstitutional change in ratemaking methods. Consumers notes that in a 1988 gas rate case involving Michigan Consolidated Gas Company (MichCon), the PSC allowed an adjustment to MichCon's projected transportation sales volume in order to allow the utility to recover the lost revenues associated with National Steel Corporation's bypass of MichCon's system. Consumers argues that the PSC's treatment of the MichCon-National Steel bypass situation created a reasonable expectation that the PSC would allow Consumers to shift to its other customers the costs associated with a special discount contract necessary to prevent bypass by James River, because by preventing bypass and loss of James River's business, Consumers' other customers would be spared having their rates adjusted upward by the PSC to reflect the loss of James River's load. In this regard, Consumers insists that had it been forewarned that the PSC might disallow rate recovery of discounts associated with a special antibypass contract offered to a competitively at-risk customer such as James River, it would not have

offered James River the special contract in the first place.

Consumers is correct in noting that an arbitrary change in ratemaking methods contrary to the reasonable expectations and reliance of investors, may constitute a violation of constitutional due process requirements. However, we are unpersuaded that there has been any such arbitrary change of methods here. Allowing a utility to make a rate adjustment for a substantial drop in expected sales volume due to the *loss* of a customer simply does not constitute the establishment of a ratemaking method for recovery of revenue shortfalls associated with *retaining* at-risk customers by charging special discount rates. The two situations simply are not analogous.

In the MichCon situation, the utility has completely lost a customer, presumably through no fault of its own, and really has no other choice but to look solely to its remaining customers to recover its full costs of service. In the instant situation, however, Consumers has retained James River as a customer, by offering specially discounted rates to compete with Panhandle, instead of allowing James River to bypass its system and then seeking an adjustment of its rates from the PSC as MichCon did. The instant situation poses substantial policy questions regarding such matters as discriminatory rates, cross-customer subsidization, and ratepayer subsidization of business risks, which questions were not involved in the situation that was presented in the MichCon case.

If Consumers had lost James River to bypass, and then were denied an adjustment in its rates necessary to reflect the resulting change in its expected sale volume, Consumers might have a valid argument that the

PSC had arbitrarily changed the method established in the MichCon case. However, by simply allowing some rate adjustments for the loss of a gas customer to bypass in the MichCon case, the PSC has hardly committed itself to any general policy in favor of antibypass measures, much less any particular ratemaking method for revenue shortfalls created by antibypass discount rates.

We are also unconvinced by Consumers' argument that it never would have entered into the special discount contract with James River had it known at the time that any of the resulting revenue shortfall might be disallowed by the PSC. After all, Consumers actually urged the PSC to grant approval of the contract itself while leaving the issue of recovery from other customers to be decided in future cases.

Finally, Consumers contends that the PSC's decision is illogical, unreasonable, arbitrary, capricious, and an abuse of discretion because Consumers' other customers are benefited by the retention of James River at discount rates that are sufficient to ensure that James River will continue to provide a contribution to Consumers' fixed costs over and above the variable costs associated with James River's service. Consumers notes that with the special discount rate, Consumers' other ratepayers continue to receive the benefit of some contribution to fixed costs by James River, yet the PSC's decision places Consumers' shareholders in a worse financial position than if they had simply allowed James River to fully bypass Consumers' system. As a result, Consumers argues, the PSC's decision in this case financially motivates utilities to simply abandon customers who have competitive choices and discourages utilities from taking actions to retain

customers they risk losing to competitors. Consumers also contends that the limited nature of the record in this case itself indicates that the PSC's decision was arbitrary and unjustified and that the PSC's decision is unsupported by competent, material, and substantial evidence on the whole record. Additionally, Consumers objects that the PSC's decision does not contain sufficient findings of fact in support of its decision to preclude recovery of a portion of the revenue shortfall.

To a large extent, Consumers' arguments are again based upon the notion that any PSC approval of the special discount contract necessarily also constitutes a determination that the costs associated with offering that discount are the kind of reasonably and prudently incurred business expenses that may be passed on to Consumers' other ratepayers. As previously noted, that notion is refuted by the fact that the PSC's approval of the special discount contract was expressly dependent upon the condition that at least some of the resulting revenue shortfall should be borne by Consumers' shareholders rather than its other customers.

Consumers' arguments also largely beg the question whether the PSC has authority to condition allowance of special discount rates upon the utility bearing some of the risks and responsibilities of resulting underrecovery. Again, we note that this Court has previously held in *Midland Cogeneration Venture*, *supra*, that the PSC is authorized to mandate adherence to its established tariff rates. If the PSC has authority to disallow any special discount rates at all, it logically follows that the PSC also has authority to allow special discount rates only on condition that no

revenue shortfall will be recovered from Consumers' other customers or, as in the instant case, on condition that at least a certain portion of the revenue shortfall will not be recovered from the utility's other customers.

We do not dispute Consumers' assertion that the PSC's disallowance of complete ratepayer recovery of the revenue shortfall involved in this case could operate in the future as a disincentive to the negotiation of similar discount contracts with other customers at risk of being lost to competitors. Nor do we disagree that such contracts may benefit other ratepayers to the extent they provide some contribution by the at-risk customer to the utility's fixed costs that would otherwise be lost in the event of bypass. However, the benefits of such contracts are also offset by policy concerns against discriminatory rates, cross-customer subsidization, and ratepayer subsidization of business risks. Whether and to what extent antibypass discount contracts should be encouraged or discouraged is essentially a legislative, policy-making decision for the PSC, involving matters for which there may be many reasonable but differing points of view. Bearing in mind the fact that the contribution to fixed costs resulting from the discounted rate is relatively small in this case, amounting to only approximately $200,000 a year, and the fact that Consumers benefits in some respects from the mere retention of James River as a customer alone, we do not find the PSC's decision in this case wholly illogical and unreasonable. We note that the PSC did not absolutely forbid any recovery of the resulting revenue shortfall from Consumers' other customers whatsoever, although the PSC arguably could have done so.

.

Rather, the PSC only precluded recovery of that portion of the revenue shortfall that constitutes the difference between the special discount rates and the T-2 rate floor.

Because the challenged aspect of the PSC's decision in this case involves a legislative, policy-making decision, rather than an adjudication of disputed issues of fact, Consumers' reliance upon the competent, material, and substantial evidence on the whole record standard of review is misplaced. *Ass'n of Businesses Advocating Tariff Equity v Public Service Comm, supra* at 205 Mich App 390. Such policy decisions are reviewable only for unlawfulness or clear abuses of discretion involving no choice between reasonably differing points of view. We are also unpersuaded by Consumers' objection to the sufficiency of the PSC's findings regarding a matter of policy choice rather than an adjudication of disputed facts. While the PSC may not have provided a detailed explanation of the reasons for its policy choice in this case, that does not necessarily mean that the PSC's decision is so illogical, unreasonable, arbitrary, and capricious as to constitute an abuse of discretion. Furthermore, we note that Consumers does not request the remedy of a remand to the PSC for clarification of the PSC's reasoning, but requests outright reversal of the PSC's decision. Consumers has not met its burden of establishing that the PSC's decision is unlawful or unreasonable.

Affirmed. No taxable costs pursuant to MCR 7.219, a question of public policy being involved.