618 N.W.2d 904 (2000)
ATTORNEY GENERAL, Plaintiff-Appellant,
v.
MICHIGAN PUBLIC SERVICE COMMISSION and Peninsular Gas Company, Defendants-Appellees.
Docket No. 115549, COA No. 205844.
Supreme Court of Michigan.
November 22, 2000.
On order of the Court, the application for leave to appeal from the June 18, 1999 decision of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.
CORRIGAN, J., concurs and states as follows:
I concur in the denial of leave to appeal. The Court of Appeals correctly declined to second-guess the Michigan Public Service Commission's (PSC) discretionary exercise of its legislative ratemaking authority. The PSC acted in the interest of Michigan utility customers by ensuring that a small utility company does not go bankrupt.
Peninsular Gas Company serves fewer than 4,000 customers in Michigan's Upper Peninsula. The Michigan Department of Environmental Quality (MDEQ) identified contamination on Peninsular's plant site and a nearby wetland. The contamination resulted from manufactured gas operations that had occurred several decades earlier. Under the Michigan environmental remediation act (MERA), 1982 PA 307; MCL 324.20101 et seq.; MSA 13A.20101 et seq., the MDEQ ordered Peninsular to pay assessment and remediation costs, initially estimated in the range of two to five million dollars. Peninsular was unable to pay the costs or obtain a loan.
Peninsular filed an application with the PSC for a rate increase to cover the environmental costs. The Michigan Attorney General intervened and opposed the application. The PSC determined that the environmental costs were unusual and would probably force Peninsular into bankruptcy. Granting rate relief to Peninsular would therefore serve the public interest. The PSC offered two options: 1) deferring the environmental costs and amortizing them over ten years, or 2) surcharging customers for seventy-five percent of the costs. Peninsular chose the latter option. The Court of Appeals affirmed the PSC's ruling. Attorney General v. PSC, unpublished opinion per curiam of the Court of Appeals, issued June 18, 1999 (Docket No. 205844). The Attorney General now appeals to this Court.
I agree with and adopt the reasoning contained in the Court of Appeals opinion:
The PSC's rate order is presumed prima facie to be lawful and reasonable. MCL 462.25(1); MSA 22.44(1). On appeal, appellants have the burden to show by clear and satisfactory evidence that the PSC's order was unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8); Michigan Intra-State Motor Tariff Bureau, Inc. v. PSC, 200 Mich.App. 381, 387, 504 N.W.2d 677 (1993). Appellants have not satisfied their burden.
In determining Peninsular's just and reasonable rates, the PSC had to determine Peninsular's reasonable costs of doing business. Detroit Edison v. PSC, 221 Mich.App. 370, 374, 562 N.W.2d 224 (1997); Detroit Edison v. PSC, 127 Mich.App. 499, 524, 342 N.W.2d 273 (1983). The PSC had the discretion to determine what charges and expenses to allow as costs of operation. Detroit v. Michigan Public Service Comm., 308 Mich. 706, 716-717, 14 N.W.2d 784 (1944); Detroit Edison v. PSC, supra at 524, 342 N.W.2d 273.
Appellants are not persuasive in arguing that any portion of the environmental clean-up costs should not be considered operating expenses of Peninsular. The costs must be paid by Peninsular.

*905 The costs are based upon Peninsular's ownership of property which the PSC found was currently needed in the ordinary course of Peninsular's service to its customers. The evidence did not indicate to the PSC that standards were violated when the waste dumping occurred which resulted in the contamination which now must be cleaned up. The evidence strongly indicated that Peninsular would face bankruptcy if rate relief were not provided.
The PSC's ratemaking process involved a balancing of the interests of Peninsular and its customers. Building Owners & Managers Ass'n of Metropolitan Detroit v. Public Service Comm., 424 Mich. 494, 510, 383 N.W.2d 72 (1986); Detroit v Michigan Public Service Comm., supra at 716, 14 N.W.2d 784; ABATE v. PSC, 208 Mich.App. 248, 267, 527 N.W.2d 533 (1994). The financial solvency of Peninsular was a legitimate factor for the PSC to consider. Michigan Bell Telephone Co. v. PSC, 332 Mich. 7, 38, 50 N.W.2d 826 (1952); Attorney General v. PSC, 189 Mich.App. 138, 472 N.W.2d 53 (1991). There is a value in continuity of service to ratepayers and there is a risk to ratepayers in the uncertainty accompanying the bankruptcy of their utility. The PSC performed the necessary balancing.
Appellants have not shown that the PSC abused its discretion in exercising its legislative ratemaking authority. Detroit Edison v. PSC, supra at 524, 342 N.W.2d 273. This Court accords deference to the judgment of the PSC in exercising its legislative function. Consumers Power Co. v. Public Service Comm., 226 Mich.App. 12, 21, 572 N.W.2d 222 (1997). The fact that the contamination arose from a different utility service provided to different customers in past years or that some of the environmental expense is associated with contamination which leeched into property not owned by Peninsular and which never provided utility service, does not change the fact that Peninsular is incurring a significant expense in the course of its business in the present. The costs involved are necessary costs for Peninsular to operate, and the costs are actually related to Peninsular's current property because that property is the source of the contamination.
We note that other courts have reached a similar result. See Chesapeake Utilities v. Delaware Public Service Comm., 705 A.2d 1059 (Del.Super., 1997), In the Matter of the Request of Interstate Power, 559 N.W.2d 130 (Minn.App., 1997), and Citizens Utility Bd. v. Illinois Commerce Comm., 166 Ill.2d 111, 117, 122-125, 209 Ill.Dec. 641, 651 N.E.2d 1089 (1995). An exception is Indiana Gas Co. v. Office of Utility Consumer Counselor, 675 N.E.2d 739 (Ind.App., 1997). However, in Indiana Gas Co. the contamination related to sites purchased by the utility after the polluting activity had ceased. The Indiana Court expressly recognized that its result might be different if the utility had owned the sites when they were used as manufactured gas facilities. [Attorney General v. PSC, at pp. 54-55.]
Our dissenting colleague questions the Court of Appeals analysis. She would grant leave to review the Attorney General's contention that the rate increase was unlawful, i.e., that it involved an erroneous interpretation or application of law. Associated Truck Lines, Inc. v. Public Service Comm., 377 Mich. 259, 140 N.W.2d 515 (1966). Specifically, the dissent relies on the Legislature's findings and declarations set forth in subsections 20102(e) and (f) of the MERA:
(e) That the responsibility for the cost of response activities pertaining to a release or threat of release and repairing injury, destruction, or loss to natural resources caused by a release or threat of release should not be placed upon the public except when funds cannot be collected from, or a response activity cannot *906 be undertaken by, a person liable under this part.
(f) That liability for response activities to address environmental contamination should be imposed upon those persons who are responsible for the environmental contamination.
The Attorney General argues that Peninsular has shifted responsibility for the contamination to the public, contrary to the legislative intent behind the MERA.
The Attorney General's argument is not persuasive. The MERA does not affect the PSC's ratemaking authority. It contains no language purporting to limit the kinds of expenses that the PSC may consider when setting utility rates.
Section 20102 states that the government may not charge the public for environmental cleanup expenses unless the responsible person cannot pay or undertake the cleanup. The MERA does not, however, purport to govern the manner in which a responsible person generates the funds to pay cleanup expenses. Businesses and utilities generally derive income from customers and, by the same token, offset expenses by passing them onto customers. Nothing in the MERA stands for the extraordinary proposition that a public utility must face bankruptcy rather than seek to increase its rates. The Attorney General's position lacks any basis in statutory or case law. If adopted, the availability of utility service for thousands of Michigan citizens would be disrupted.
I reject the dissent's contention that my position frees the PSC from the provisions of the MERA. Concededly, the PSC's orders must be lawful and reasonable, but the Attorney General has not shown by clear and satisfactory evidence that the PSC's order was unlawful. Neither the Attorney General nor our dissenting colleague have identified any provision of the MERA that confines the PSC's discretion to determine what charges and expenses to allow as costs of operation.
The dissent confuses the imposition of liability on a responsible person with the normal business practice of passing expenses on to customers. The dissent has not considered subsections 20102(i) and (j), which require a unit of government to assume responsibility when it is liable under the act in the same manner as other responsible persons. When a governmental entity becomes liable, the taxpayers inevitably foot the bill. Under the dissent's reasoning, § 20102 is internally inconsistent. On the one hand, subsections e and f bar a responsible person from passing on costs, but on the other hand, subsections (i) and (j) require a responsible governmental entity to pass costs on to taxpayers.
Fortunately, this contradiction does not arise because the dissent's construction has no basis in the text of subsections (e) and (f). As discussed, those subsections do not govern the means by which a responsible person generates the funds to pay cleanup expenses. Subsections e and f do not prohibit a business, utility, or governmental entity from following their normal practices of passing costs on to customers, ratepayers, or taxpayers.[1]
*907 MARILYN J. KELLY, J., dissents and states as follows:
I would grant leave to consider whether the Michigan Public Service Commission (MPSC) lawfully and reasonably ruled that Peninsular Gas Company (Peninsular) could transfer to its customers the expense of cleaning environmental pollution from land it owns.
The Department of Environmental Quality identified Peninsular as a party liable for environmental contamination under the Michigan environmental remediation act (MERA), M.C.L. § 324.20101 et seq.; MSA 13A.20101 et seq. Peninsular filed an application for a rate change with the MPSC, seeking an increase to pay for the costs assessed (Case No. U-11127). The MPSC found that, without the rate increase, the cleanup would force Peninsular into bankruptcy. Thus, it determined that the public interest required it to grant relief.
The MPSC gave Peninsular the choice of either 1) deferring the environmental costs and amortizing them over ten years, which would then be considered an expense and consequently recovered in future rates, or 2) surcharging its approximately 3,700 customers seventy-five percent of the costs. Peninsular opted for the second choice.
The Attorney General intervened, arguing that Peninsular should not be able to transfer these costs directly to its customers. The Court of Appeals disagreed. It specifically found that financial solvency is a legitimate factor for the MPSC to consider and that there is a value to ratepayers in assurance of continued service.
An order of the MPSC approving a rate increase must be lawful and reasonable. MCL 462.26(8); MSA 22.45(8). The Attorney General must show by clear and satisfactory evidence that the order is either unlawful or unreasonable. Id. We have defined "unlawful" as an erroneous interpretation or application of law, whereas "unreasonable" means unsupported by the evidence or an abuse of discretion. Associated Truck Lines, Inc. v. Public Service Comm., 377 Mich. 259, 279, 140 N.W.2d 515 (1966). This is the very broad "zone of reasonableness" within which the MPSC may operate. Michigan Bell Telephone Co. v. MPSC, 332 Mich. 7, 26, 36, 50 N.W.2d 826 (1952).
A serious question is raised in this case whether the decision to allow the rate surcharge is either lawful or reasonable.[1] The MPSC and the Court of Appeals focused on the fact that Peninsular would face bankruptcy if it had to pay for the cleanup without the increase. Neither the MPSC nor the Court of Appeals addressed the Attorney General's argument that the increase is unlawful. The Attorney General reasons that the liability consequences here conflict with the "polluter pays" policy of the MERA.
That law, at § 20102, sets forth the following findings and declarations:
(e) That the responsibility for the cost of response activities pertaining to a release or threat of release and repairing injury, destruction, or loss to natural resources caused by a release or threat of release should not be placed upon the public except when funds cannot be collected from, or a response activity cannot be undertaken by, a person liable under this part.
(f) That liability for response activities to address environmental contamination should be imposed upon those *908 persons who are responsible for the environmental contamination.
Peninsular's environmental cleanup costs are estimated to be between $2 and $5 million. The Attorney General asserts that, in passing to its 3,700 Upper Peninsula customers seventy-five percent of the costs, Peninsular shifts its responsibility for the contamination to the public.[2] This circumvents the Legislature's intent to hold persons causing environmental contamination liable for the cost of cleaning it up. Moreover, the Attorney General argues, imposing these significant costs on this small customer base results in unreasonable rates, amounting to an abuse of discretion on the part of the MPSC.
Justice Corrigan, in her concurring statement, seems to assert that the MPSC is not bound by the provisions of the MERA. Being that the orders of the MPSC must be lawful, one ponders what authority exempts the law of the MERA from the commission's consideration.
The concurring statement also misconstrues my position on this issue. I do not contend that subsections 20102(e) and (f) bar passing on the costs of environmental cleanup to customers. But, as the concurrence observes, the government may not charge the public for such costs when the responsible party can pay them. My concern in this case is whether the MPSC gave full consideration to this provision of the MERA.
The fact that subsections 20102(i) and (j) require a unit of government to assume responsibility when it is liable is irrelevant. Peninsular is not a governmental entity. Unlike a governmental entity, Peninsular paid approximately $724,000 to a single shareholder during 1993-1995.
Nor does my position create any internal inconsistencies in § 20102. The overriding import of that section is that, if the party responsible for the environmental contamination can pay, it should. Naturally, a governmental entity that has no revenue other than taxpayer dollars will clean up contamination it caused with those dollars. But Peninsular does not derive its revenue solely from taxpayers.
In this case it is the public that is bearing the expense for environmental contamination caused by Peninsular.[3] Neither the MPSC nor the Court of Appeals addressed whether allowing this to occur conflicts with the MERA's "polluter pays" policy.
The ratemaking process involves a balancing of investor and consumer interests. Building Owners & Managers Ass'n of Metropolitan Detroit v. Public Service Comm., 424 Mich. 494, 510, 383 N.W.2d 72 (1986). On one hand, the financial health of a utility is an important consideration. On the other, an order allowing a rate increase must be reasonable and lawful. MCL 462.26(8); MSA 22.45(8). There is a serious question whether, to save Peninsular from allegedly possible bankruptcy, the MPSC has glossed over the reasonableness and lawfulness of its order, given the provisions of the MERA.[4]
*909 I do not contend that a polluter may never pass on the costs of environmental contamination to its customers. Subsection 20102(e) of the MERA makes it clear, however, that it may not do so in all cases. I would grant leave to consider whether Peninsular should be able to do so in this case.
MICHAEL F. CAVANAGH, J., joins in the statement of MARILYN J. KELLY, J.
NOTES
[1] The dissent observes that Peninsular is not a governmental entity. I have not suggested that it is. In discussing subsections (i) and (j), I merely observe that they call into question the dissent's interpretation of subsections (e) and (f).

Our dissenting colleague further asserts without explanation that she does not contend that subsections (e) and (f) bar passing on the costs of environmental cleanup to customers. However, the very first sentence of the dissenting statement questions whether Peninsular "could transfer to its customers the expense of cleaning environmental pollution from land it owns." Op., p. 907. Additionally, the dissent discusses favorably the Attorney General's argument "that, in passing to its 3,700 Upper Peninsula customers seventy-five percent of its costs, Peninsular shifts its responsibility for the contamination to the public. This circumvents the Legislature's intent to hold persons causing environmental contamination liable for the cost of cleaning it up." Op. p. 908. The entire premise of the dissenting statement is to question whether Peninsular may pass on its cleanup costs. Our dissenting colleague's conclusory assertion inexplicably contradicts her own position.
[1] The MPSC did not analyze whether Peninsular does face bankruptcy, but instead seemed to accept Mr. March's assertion that it does. See U-11127, pp. 26, 36. A review of U-11127 raises questions about the reasonableness of this conclusion. For instance, although Peninsular was put on notice in January 1993 that it was a liable party under the MERA, Mr. March, Peninsular's sole shareholder and president, paid himself in excess of $724,000 during 1993-1995. U-11127, p. 29.
[2] In its brief, Peninsular stated that the surcharges requested in Case No. U11127 would represent an increase of 13.89 percent in rates. The Attorney General's brief indicates that the request represented a 20.56 percent increase in rates.

The actual costs of cleaning up the contamination have not yet been fully realized. Additionally, the Department of Environmental Quality has agreed to assume a portion of them. Therefore, the exact rate increase Peninsular's customers face is uncertain.
[3] On December 21, 1998, the Michigan Department of Environmental Quality assumed financial responsibility for seventy-five percent of the cost of the remediation activities. Moreover, Peninsular already has recovered $430,000 from its ratepayers. It seeks to recover another $393,000.
[4] The Court of Appeals opinion and the concurring statement both note that Peninsular's customers have an interest in receiving utility service without disruption. But nothing in the briefs suggests that no other utility provider can meet the utility demands of Peninsular's customers.